UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Jennifer Artesi | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-CV-00214-SM |
| | ) | |
| DeMoulas Super Markets, Inc. d/b/a | ) | |
| Market Basket, and | ) | |
| Dennis Labatte | ) | |

# Excerpts of the Deposition of

# Jennifer Artesi

# In support of the Defendants'

# Motion for Summary Judgment

1

1                     UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW HAMPSHIRE
2

3     * * * * * * * * * * * * * * * * * * * * * * *
                                    *
4     JENNIFER ARTESI f/k/a    *
      JENNIFER TAPSCOTT,       *
5               Plaintiff,     *
                               *
6          vs.                 *   Docket No.:
                               *   1:19-CV-00214-AJ
7     DEMOULAS SUPER           *
      MARKETS, INC., d/b/a     *
8     MARKET BASKET and        *
      DENNIS LABATTE,          *
9               Defendants.    *
                               *
10    * * * * * * * * * * * * * * * * * * * * * * *

11                **DEPOSITION OF JENNIFER ARTESI**

12                      Deposition taken by agreement

13                      at the Fox Hill Farm,

14                      333 Holderness Road, Center

15                      Sandwich, New Hampshire, on

16                      Thursday, November 7, 2019,

17                      commencing at 10:10 a.m.

18    Court Reporter:   Sharon R. Fagan, LCR, RPR
                        N.H. Licensed Court Reporter
19                      No. 64

20

21

22

23

2

1                        **<u>APPEARANCES</u>**

2

<u>For the Plaintiff</u>:    LAW OFFICES OF
3                         LESLIE H. JOHNSON, PLLC
                          46 Holderness Road
4                         Center Sandwich, NH  03227
                          By:  Leslie H. Johnson, Esq.
5

6

<u>For the Defendants</u>:   MAGGIOTTO, BELOBROW,
7                         FEENEY & FRAAS, PLLC
                          58 Pleasant Street
8                         Concord, NH  03301
                          By:  Dona Feeney, Esq.
9

10  <u>Also present</u>:         Joseph W. Schmidt,
                          Store Operations
11                        DeMoulas Market Basket

12

13

14

15

16

17

18

19

20

21

22

23

1                        **STIPULATIONS**

2                    It is agreed that the deposition shall

3       be taken in the first instance in stenotype and when

4       transcribed may be used for all purposes for which

5       depositions are competent under Federal Rules of

6       Civil Procedure.

7                    Notice, filing, caption and all other

8       formalities are waived.  All objections except as to

9       form are reserved and may be taken in court at time

10      of trial.

11                   It is further agreed that if the

12      deposition is not signed within thirty (30) days

13      after submission to counsel, the signature of the

14      deponent is waived.

15

16

17

18

19

20

21

22

23

59

1    right, he called Palm Partners in West Palm Beach; is

2    that accurate?

3         A.    He called a referral service, a

4    referral number.

5         Q.    And then what happened?

6         A.    They referred him to that place.

7         Q.    Palm Partners?

8         A.    I believe that's who he spoke to.

9         Q.    And how did it happen that you then

10   were flown down to Florida?

11        A.    They got me a ticket -- they paid -- as

12   long as I could get to the airport, they were going

13   to fly me out to Florida to go to the facility.

14        Q.    Did you yourself have any conversations

15   with anybody at the organization that was flying you

16   down?

17        A.    No.

18        Q.    Had you ever taken any treatment or

19   services for alcoholism prior to December 29, 2016?

20        A.    Yes.

21        Q.    Where and when?

22        A.    In 2000, I went to the Portsmouth

23   Pavilion.  I believe it was August 12, 2000.

60

1          Q.      Was that inpatient or outpatient care?

2          A.      Inpatient.

3          Q.      For how long?

4          A.      Seven days, maybe.

5          Q.      And who was the healthcare provider

6     that you saw?

7          A.      I don't remember.

8          Q.      What led you to seek treatment at the

9     Portsmouth Pavilion in 2000?

10         A.      My drinking was interfering with

11    everyday life.

12         Q.      Were you working at the time?

13         A.      Yes.

14         Q.      And where were you working?

15         A.      DeMoulas Market Basket.

16         Q.      Were you working full-time at that time

17    you entered the Portsmouth Pavilion?

18         A.      Yes.

19         Q.      Did you have to take time off?

20         A.      Yes.

21         Q.      Did you put in for FMLA time?

22         A.      I believe so.

23         Q.      And you were able to take the time and

61

1    then return to work?

2         A.    Yes.

3         Q.    How long were you out of work at that

4    time, do you recall?

5         A.    I don't remember.

6         Q.    Was it longer than the seven days you

7    were an inpatient at the Portsmouth Pavilion?

8         A.    I'm not sure.

9         Q.    What other healthcare providers were

10   you seeing in 2000 --

11        A.    I can't remember.

12        Q.    -- other than Dr. Yarian?

13        A.    I know I had seen -- just before that,

14   I had seen Dr. Schopick in Portsmouth.

15        Q.    Do you know how to spell Dr. Schopick's

16   name?

17        A.    S-c-h --

18        Q.    It's an "S"?

19        A.    Yes.

20        Q.    And what kind of doctor is

21   Dr. Schopick?

22        A.    Psychiatrist.  The one that prescribes

23   the medications.

74

1          Q.     And Palm Partners is located in
2     South Miami; is that correct?
3          A.     I think it's West Palm Beach.
4          Q.     West Palm.
5          A.     I might have a card.  Do you want me to
6     look?
7                 MS. JOHNSON:  Just answer the question.
8          Q.     (By Ms. Feeney)  Well, yeah, I mean --
9          A.     I believe it's West Palm.
10         Q.     Okay.  If you have any information with
11    you that would help me with the address, when we take
12    the next break, I'm going to ask you to take a look
13    for it.  Okay?
14         A.     Okay.
15         Q.     And so was Palm Partners the name of
16    the facility in West Palm Beach?
17         A.     Yes.
18         Q.     So how long did you stay there?
19         A.     From December 29th until either
20    January 3rd or 4th.
21         Q.     And who was the healthcare provider
22    that you saw while you were in Palm Partners?
23         A.     I don't recall.

75

1          Q.      Did you make application for leave from

2     DeMoulas during the time you were at Palm Partners?

3          A.      While I was at Palm Partners?

4          Q.      Yes.

5          A.      No.

6          Q.      Did you have someone on your behalf

7     make an application for leave from DeMoulas when you

8     were at Palm Partners?

9          A.      No.

10         Q.      Who is Linda Drury?  Can you take back

11    -- look back at Exhibit 4, please?

12         A.      Yeah.

13         Q.      Who is Linda Drury?

14         A.      A coworker at Market Basket.

15         Q.      And does she still work at

16    Market Basket?

17         A.      I don't know.

18         Q.      How long did you work as coworkers with

19    Linda Drury, D-r-u-r-y?

20         A.      I'm not sure, but it could have been a

21    year or more.

22         Q.      And you indicate in Exhibit 4 that she

23    was a witness to comments that were made towards you

1          A.     She was my produce manager at

2     Market Basket.

3          Q.     So when Marc Plante drove you to Logan

4     to get on the flight to go to Florida on December the

5     29th, who was it that you had contact your employer,

6     Market Basket, after December the 29th?

7          A.     My husband.

8          Q.     And what did you instruct your husband

9     to do?

10         A.     To call and say I wouldn't be in.

11         Q.     When did you tell your husband to call

12    your employer and tell them that you wouldn't be in?

13         A.     The night I arrived at Palm Partners,

14    they let me use the phone to contact him.

15         Q.     Did you tell your husband before you

16    got on the plane to Florida that you were going to

17    Florida for detox care?

18         A.     No.

19         Q.     Why not?

20         A.     I can't answer that.

21         Q.     Why?

22         A.     It was -- because I had asked Marc to

23    help me, and spur of the moment, because I had a

1    facility, so I got on the plane and jumped on the

2    offer.  I don't know if those were my wordings,

3    but....

4            Q.       Understood.  And so you told him that

5    you had an opportunity to go to this detox facility

6    in Florida and you took advantage of it -- just

7    paraphrasing -- is that accurate?

8            A.       Yes.

9            Q.       What else did you talk about?

10           A.       Just about calling work for me.

11           Q.       And did you tell him to speak to anyone

12   in particular?

13           A.       Yes.

14           Q.       Who did you tell him to talk to?

15           A.       Mandy, my manager.

16           Q.       And what did you tell him to tell

17   Mandy, your manager?

18           A.       That I wouldn't be in that day.

19           Q.       But you were aware that you were in a

20   detox facility in Florida, so you weren't going to be

21   out the same day; correct?

22           A.       That I was going to be out, and I

23   believe he had mentioned until further notice.  I

1    that prior to that, you were at the Rochester

2    location from approximately November of 2001 until

3    May of 2006.

4              Does that sound about right?

5         A.    Yes.

6         Q.    How long were you, in fact -- strike

7    that.

8              You told me you were at Palm Partners

9    until January 3rd or January 4th of 2017; is that

10   accurate?

11        A.    I'm not sure of the date, but it was

12   somewhere there.

13        Q.    What facility did you go to after that?

14        A.    The G & G.

15        Q.    The G & G facility?  Is that a separate

16   facility?

17        A.    Yes.  It's the one I gave you the card.

18        Q.    I know you gave me the card.  Is it --

19        A.    Yes.

20        Q.    Let me finish the question.  Is it a

21   separate facility than the Palm Partners facility?

22        A.    Yes.

23        Q.    And understanding that the person

1    we discussed may no longer be with G & G; G & G is

2    another facility.

3         A.    Yes.

4         Q.    And where is that facility located?

5         A.    Miami, Florida.

6         Q.    And why were you admitted to the G & G

7    facility in Miami, Florida, after your stay at

8    Palm Partners?

9         A.    For further treatment of alcoholism.

10        Q.    How long were you there?

11        A.    Until February 8th, 2017.

12        Q.    And you told me that facility is in

13   Miami; is that correct?

14        A.    Yes.

15        Q.    Were you at the same G & G facility for

16   the entire time?

17        A.    Yes.

18        Q.    And when you were discharged from that

19   facility on February 8, 2017, where did you go?

20        A.    I came home.

21        Q.    To New Hampshire?

22        A.    Yes.

23        Q.    To the address you told us earlier in

1    the deposition.

2              A.      Yes.

3              Q.      Did you or anyone on your behalf notify

4    anyone at Market Basket about the Palm Partners

5    location during the time that you were an inpatient

6    there?

7              A.      I don't believe so.

8              Q.      Did anyone on your behalf or you notify

9    anyone at Market Basket about the further inpatient

10   treatment at G & G?

11             A.      No.

12             Q.      Did you notify your husband that you

13   were switching from the Palm Partners inpatient care

14   to G & G?

15             A.      Yes.

16             Q.      When did you talk to him?

17             A.      I'm not sure.

18             Q.      During the time period between

19   December 29th, 2016, and January 3rd or 4th, 2017,

20   while you were an inpatient at Palm Partners, on how

21   many occasions did you speak to your husband?

22             A.      Just that one time when I got there.

23             Q.      Were you allowed to make phone calls to

89

1              When you were discharged from

2    Palm Partners, did you go directly to G & G?

3         A.    Yes.

4         Q.    And so you spent approximately another

5    month at G & G as an inpatient; correct?

6         A.    Yes.

7         Q.    Did you inform your husband about this

8    new facility that you were at?

9         A.    Yes.

10        Q.    And when did you talk to your husband

11   about the fact that you were moving from Palm

12   Partners to G & G?

13        A.    I'm not sure.

14        Q.    Was it while you were still at

15   Palm Partners or was it after you got to G & G?

16        A.    I believe it was when I got to G & G.

17        Q.    Did you call your husband?

18        A.    Yes.

19        Q.    And what did you tell him?

20        A.    I don't remember what I told him, but I

21   told him that I was staying longer at a treatment

22   center.

23        Q.    Did you give him any instructions to

90

1    speak to anybody at your place of employment?

2         A.     No.

3         Q.     Who was getting your mail while you

4    were an inpatient at Palm Partners?

5         A.     John.

6         Q.     Your husband.

7         A.     My husband.

8         Q.     And who was getting your mail while you

9    were an inpatient at G & G?

10        A.     My husband.

11        Q.     Had you left instructions when you

12   spoke to John after you transferred from Palm

13   Partners to G & G to make sure that he was opening

14   your mail?

15        A.     No.

16        Q.     Did you expect that he would open your

17   mail since you were continuing --

18        A.     No.

19        Q.     Let me finish.  Did you expect that he

20   would be opening your mail since you were continuing

21   on in inpatient care?

22        A.     No.

23        Q.     Did you instruct anyone, Marc Plante or

95

1    down.  If it comes to you, let me know.

2                  So the hospital for pancreatitis?

3         A.     Yes.

4         Q.     And that was around February the 3rd?

5         A.     I went in the 2nd.

6         Q.     Okay.

7         A.     February 2nd.

8         Q.     All right.  And it starts with an "A."

9    And it's in Miami?

10        A.     I think it's right out of Miami.

11        Q.     All right.  And you went there with

12   pancreatitis.

13                 So it looks like there's another number

14   after your husband's number that you call on the same

15   day shortly after that, 868-6786.

16                 Whose number is that?

17        A.     That's my mother.

18        Q.     And where does your mother live?

19        A.     Florida.

20        Q.     Where in Florida?

21        A.     Port Orange.

22        Q.     And what is your mother's full name?

23        A.     Elaine MacDonald.

1        Q.      And why were you calling your mother?

2        A.      To tell her I was in the hospital.

3        Q.      Did your mother know you had been down

4    in Florida since late December in each of two

5    different facilities?

6        A.      I believe so.

7        Q.      How would she have known?

8        A.      I probably called her once I got out of

9    the Palm Partners.

10       Q.      The number under your mother's on

11   February 4th is your husband again; correct?

12       A.      The 269, yes.

13       Q.      Correct.  Okay.  So that's your

14   husband.  It looks like you were on the phone with

15   your husband for almost 30 minutes on that day.

16               Were you in the medical hospital at

17   that time?

18       A.      I don't remember -- I left that day.  I

19   don't remember what time I left.

20       Q.      You left what, I'm sorry?

21       A.      The general hospital.  I left that

22   hospital to go back to G & G on the 4th.

23       Q.      How long were you in the general

110

1    leave.

2           A.     I didn't have anybody --

3           Q.     I'm not being -- it's not judgmental.

4                  MS. JOHNSON:  Can she finish her

5    answer?

6                  (By Ms. Feeney) Just tell me, you chose

7    to stay, not to leave.

8           A.     Yes.

9           Q.     Okay.  That's fine.

10                 So from January 18, 2017 to

11   January 28, 2017, you had what you've described as

12   this outpatient status, but you didn't have anyplace

13   to go to stay, so you stayed there; correct?

14          A.     Yes.

15          Q.     Did the privileges that you had change

16   during the time that you had self-help outpatient

17   status?

18          A.     No.  You also were allowed to leave to

19   go to AA meetings off the premises, but other than

20   that, no.

21          Q.     Could you use the phone?

22          A.     Yeah.  We were allowed to use our

23   phone.

115

1    remember it as you sit here; is that fair?

2          A.     Yes.

3          Q.     All right.

4                 MS. JOHNSON:  Off the record.

5                 (Off-the-record discussion.)

6                 MS. FEENEY:  Back on.

7                 (Back on the record.)

8          Q.     (By Ms. Feeney) Exhibit 5 is notifying

9    you about what happens to your benefits while you are

10   on leave at the company; correct?

11         A.     Yes.

12         Q.     All right.

13                (Artesi Exhibit No. 6 was

14                marked for identification.)

15         Q.     (By Ms. Feeney) I'd like to show you

16   what's been marked Exhibit 6.  It's a series of

17   documents, notices to you from Market Basket

18   concerning your benefits in the time frame of late

19   June 2011.

20                Can you take a look at that for me,

21   please?

22         A.     Yes.

23                MS. JOHNSON:  Look at each page.  Okay.

116

1    Five and six.  All right.  I just don't have a copy

2    of 5.  I just want to make sure I know what we're

3    talking about.

4              So just look at each page.  You don't

5    have to read the whole thing.  Just see if it looks

6    familiar.

7         Q.    (By Ms. Feeney) All I want to know

8    is -- it's substantially similar to the one I just

9    had marked as Exhibit 5.  This is a different year,

10   June of 2011 -- does this look familiar to you?

11        A.    Yes.

12        Q.    This is something you would have

13   received as part of your leave of absence when you

14   were at Market Basket; correct?

15        A.    Yes.

16        Q.    Do you remember what you took the leave

17   of absence for in 2011?

18        A.    Shoulder repair.

19        Q.    Shoulder repair.  Right or left?

20        A.    Left.

21        Q.    Had you injured it or was it just

22   something that wore out, or do you recall?

23        A.    It happened at work.  I injured it.

118

1          Q.      Was it -- what was the surgery for?

2          A.      A torn rotator cuff.

3          Q.      But on the left side.

4          A.      Yes.

5                  MS. JOHNSON:  Off the record.

6                  (Off-the-record discussion.)

7                  (Back on the record.)

8          Q.      (By Ms. Feeney) So staying with the

9    time frame of June 2011, you had a torn rotator cuff

10   on the left side that made you be out of work for,

11   what did you say, 12 weeks?

12         A.      11 or 12.

13         Q.      Okay.  Fair enough.  Some period of

14   weeks.  And you were on leave for that and you

15   received these letters as part of it; is that

16   correct?

17         A.      Yes.

18         Q.      And was the torn rotator cuff something

19   that was a work-related injury?

20         A.      Yes.

21         Q.      All right.

22                 (Artesi Exhibit No. 7 was

23                 marked for identification.)

119

1          Q.      (By Ms. Feeney) I'd like to show you

2     what we've had marked as Exhibit 7, again, letters

3     concerning benefit continuation notices.  This time

4     frame is August of 2013.

5                  MS. JOHNSON:  So look at each page so

6     you know what you're looking at.

7          Q.      (By Ms. Feeney) What caused you to be

8     out of work in August of 2013, do you recall?

9          A.      I tore my bicep on my left shoulder.

10         Q.      Was that a work-related injury?

11         A.      Yes.

12         Q.      Did you have to have surgery?

13         A.      Yes.

14         Q.      And how long were you out of work, do

15    you recall?  Just approximately.

16         A.      Does it say?

17         Q.      No.  That's why I'm asking.

18         A.      10, 11 weeks.

19         Q.      Okay.  So a period of time longer than

20    a month or so.

21         A.      Yeah.

22         Q.      And those are the notices that you got

23    as a result of being out on leave in Exhibit 7;

1   correct?

2        A.     Yes.

3        Q.     All right.  Would you take a look,

4   please, at Exhibit 4, Page JA-17.

5        A.     (Witness complied.)

6               (Off-the-record discussion.)

7               (Back on the record.)

8        Q.     (By Ms. Feeney) Are you at Page JA-17

9   on our Exhibit No. 4?

10       A.     Yes.

11       Q.     Okay.  Great.  That is a note from

12  Dover Women's Health taking you out of work from

13  May 24th, 2016 to June 10th, 2016.

14              Do you see that?

15       A.     Yes.

16       Q.     What was the reason you were out of

17  work in May to June of 2016?

18       A.     I had had a hysterectomy done a month

19  or so before.  I came back, I lifted something, I

20  pulled a muscle.  I went to see him, so he wanted me

21  to rest in case anything serious had happened.

22       Q.     How long were you out when you had the

23  hysterectomy?

121

1          A.     I'm not sure.

2          Q.     More than a month?

3          A.     I'm not sure, honestly.

4          Q.     All right.  And was it approximately a

5    month before June of 2016?  So was it in March or

6    April of '16?

7          A.     Correct.

8          Q.     All right.  Can you walk me through

9    your understanding of what you needed to do to take

10   leave time when you worked at DeMoulas, whether it

11   was for a day or whether it was going to be for a

12   medical procedure that kept you out for more than a

13   day?  What would you typically have to do?

14         A.     Usually ask first, and then fill out

15   paperwork and send it to the HR person.

16         Q.     So you would request if you were going

17   to take the time off, and then assuming that whoever

18   you requested said okay, and you then would fill out

19   leave paperwork; is that correct?

20         A.     Yes.

21         Q.     Do you understand what FMLA or Family

22   Medical Leave is?

23         A.     If yourself or somebody in your family

122

1    needs to take time off from work, it keeps your job.

2         Q.     Did you ever make a request for FMLA

3    leave while you were at Shaw's?

4         A.     No.

5         Q.     And you did make requests for FMLA

6    leave when you worked at DeMoulas; correct?

7         A.     Yes.

8         Q.     Do you know on how many occasions?

9         A.     Probably all my surgeries.

10        Q.     All right.  Do you have an

11   understanding of how much time FMLA provides?

12        A.     12 weeks a year.

13        Q.     12 weeks?  And do you have to earn that

14   or is that an automatic 12 weeks?

15             MS. JOHNSON:  Objection to form.

16        Q.     (By Ms. Feeney) Sure.  You can answer.

17        A.     I'm not sure when you first start how

18   long it would take, but then I think once you're

19   established, I don't know how, but then you're

20   allowed.  I think it's just for full-timers, but I'm

21   not positive.

22        Q.     Do you have to have a doctor help fill

23   out some of that paperwork for FMLA leave?

125

1          Q.      (By Ms. Feeney) Can you take a look at

2      the next two pages of Exhibit 8, please?  It starts

3      with the title, "Request for Family or Medical

4      Leave."

5                  Do you see that?

6          A.      Yes.

7          Q.      And did you fill any of this paperwork

8      out?

9          A.      No.

10          Q.      Do you recognize anybody's handwriting

11      on this paper?

12          A.      No.

13          Q.      Can you take a look at the next page of

14      Exhibit 8?  It also says "Request for Family or

15      Medical Leave."

16                  Do you see that?

17          A.      Yes.

18          Q.      And do you see at the bottom it has

19      "Employee Signature"?

20          A.      Yes.

21          Q.      Is that your signature?

22          A.      Yes.

23          Q.      And the leave you are requesting is

126

1    from December 30th, 2016 to February 6, 2017; is

2    that accurate?

3            A.     Yes.

4            Q.     And it's dated January 9th, 2017, at

5    the top.

6                   Do you see that?

7            A.     Yes.

8            Q.     Do you know when you signed this piece

9    of paper?

10           A.     No.

11           Q.     Okay.

12                  (Artesi Exhibit No. 9 was

13                  marked for identification.)

14           Q.     (By Ms. Feeney) Have you had a chance

15   to look at Exhibit 9?

16           A.     Yes.

17           Q.     Have you seen these documents before?

18           A.     I believe the beginning.  The last, I'm

19   not -- probably not.

20           Q.     Can we agree that this is the blank

21   FMLA form that was sent to you in early January by

22   Market Basket to complete?

23           A.     I didn't get this.

137

1          A.      My husband called the 10th.

2          Q.      Not my question.  My question is,

3     when was the first time you called anyone at

4     Market Basket after you returned to New Hampshire on

5     February 8th?

6          A.      I would have to look at the record.

7          Q.      What record would you need to look at?

8          A.      The phone records.

9          Q.      The ones that are in Exhibit 4?

10         A.      Yeah.

11         Q.      Go ahead.

12         A.      This one, right?

13         Q.      I think that's Exhibit 4, yeah.  I

14    think they're in the beginning.  There we go.

15         A.      February 28th.

16         Q.      And that's based on a phone record

17    that you're looking at in Exhibit 4; is that right?

18         A.      Yes.

19         Q.      Give me one second to catch up with

20    you, if I can, please.

21                 So what number are you referring to for

22    February 28th?

23         A.      603-742-8937.

138

1          Q.      Okay.  And what number does that

2     connect to?  What is that the phone number for?

3          A.      The Somersworth Market Basket.

4          Q.      Somersworth.

5                  (Off-the-record discussion.)

6                  (Back on the record.)

7          Q.      (By Ms. Feeney) So at 3:06 p.m. on

8     February the 28th, you called the Somersworth

9     Market Basket; is that correct?

10         A.      Yes.

11         Q.      And that's the first time you called

12    your employer after returning to New Hampshire on

13    February the 8th; am I correct?

14         A.      Yes.

15         Q.      And you had seen Dr. Yarian on

16    February the 15th; is that correct?

17         A.      Yes.

18         Q.      So help me understand why Exhibit 12

19    has a date of February 22nd, 2017, on it.

20                 Did you ask him for a note while you

21    were there on February 15th?

22         A.      Yes.

23         Q.      And seven days later, he writes

141

1          A.      They were going to send one.

2          Q.      They were going to send one to you and

3     they were going to send one to Market Basket?

4          A.      Yes.

5          Q.      How did you give them the information

6     to send to Market Basket?

7          A.      I gave them the address.

8          Q.      So you were going to have them mail it;

9     is that correct?

10         A.      Yes.

11         Q.      As of February 15th when you were at

12    Dr. Yarian's office for your visit, were you aware of

13    the fact that you no longer had any more FMLA time?

14              MS. JOHNSON:  Objection to form.

15         Q.      (By Ms. Feeney) You can answer.

16         A.      No.

17         Q.      Why did you wait until February 28th to

18    call your employer, to call Market Basket after you

19    returned to New Hampshire on February 8th?

20         A.      Because I didn't want to deal with

21    Mr. Labatte, so I called Jerry, assuming I was still

22    covered under FMLA.

23         Q.      When did you call Jerry?

1   the 9th or 10th of February?

2       A.      Because it was Friday.  Jerry wasn't

3   there.  And me and my husband were talking about

4   letting them know, so my husband made the phone call

5   so I wouldn't have to -- I was a mess.  I didn't want

6   to get on the phone with him.

7       Q.      Okay.  Let me talk a little bit more

8   about this.

9               So you didn't want to call the store

10  when you returned.  Do I have that correct?

11      A.      Yeah.

12      Q.      Yet, you called Jerry Paquette on

13  February the 28th, 20 days later; correct?

14      A.      Yes.

15      Q.      My question is, why you didn't call

16  Jerry Paquette five days later or ten days later or

17  six days later?  Why did you wait 20 days to call

18  Jerry Paquette?

19              MS. JOHNSON:  Objection to form.

20      Q.      (By Ms. Feeney) You can answer.  Why

21  did you wait 20 days to call Jerry?

22      A.      Well, my husband called to inform them

23  I was back, and then I wanted -- once I found out

144

1    when I was going to return to work, the week before,

2    I called Jerry.  I should -- to report to Jerry was

3    not where I was at.  Labatte was supposed to know.

4    He was informed from my husband, so there was no need

5    for me to call anybody else.  Then I just called

6    Jerry to find out if I was on the schedule.

7              Q.    Why did you ask your husband to call --

8              A.    Because I didn't want to --

9              Q.    You need to let me finish the question.

10             Why did you ask your husband to call

11   Mr. Labatte?

12             MS. JOHNSON:  Objection to form.  She's

13   answered that three times.

14             MS. FEENEY:  I don't think she has,

15   but --

16             MS. JOHNSON:  Well, she has.

17             MS. FEENEY:  The record will reflect

18   what she said.

19        Q.    (By Ms. Feeney) Why did you ask your

20   husband to call Mr. Labatte?

21        A.    Because I didn't want to get harassed

22   on the phone from him.

23        Q.    Oh, okay.  So that's an answer that I

1    that makes any sense.

2         Q.    Well, I don't know whether it makes any

3    sense or not.

4               Are you saying that DeMoulas failed to

5    accommodate your request for certain times for leave?

6         A.    Well, the environment wasn't right.

7         Q.    I'm not talking about an environment,

8    ma'am.  I'm talking about a request that you made for

9    an accommodation that was not honored or granted.

10   What are you talking about?

11        A.    I don't even know how to answer that.

12   I don't know -- the question, if you can specify

13   more.  I don't even --

14        Q.    Well, let me try and make it clear.

15   You told me that your disability is a mental

16   disability.  Do I have that correct?

17        A.    Yes.

18        Q.    And so as you sit here today, on what

19   occasions did you request an accommodation from

20   DeMoulas for your mental disability?  Can you think

21   of any?  If you can't, that's fine.  I just want to

22   know what it was.

23        A.    I can't think of any.

165

1          Q.     (By Ms. Feeney) You were granted leave
2     when you had your hysterectomy; correct?
3          A.     Yes.
4          Q.     And you had to take time off after the
5     hysterectomy at your doctor's prompting; is that
6     correct?
7          A.     Yes.
8          Q.     And you were granted that time off; is
9     that correct?
10         A.     Yes.
11         Q.     All right.  What did anyone at
12     DeMoulas, including but not limited to Mr. Labatte,
13     ever say to you about your mental disability or your
14     mental illness?
15                    MS. JOHNSON:  Objection to form.
16                    THE WITNESS:  Can you repeat that?
17                    MS. FEENEY:  Sure.  Would you read the
18     question back?
19                    (Last question was read.)
20                    MS. JOHNSON:  Same objection.  You can
21     answer.
22                    THE WITNESS:  Well, he made some nasty
23     comments.

166

1          Q.     (By Ms. Feeney) Specifically what?

2          A.     After my hysterectomy, he said, "What

3    are you good for now?"

4          Q.     Ma'am, I'm asking about your mental

5    disability.

6                 MS. JOHNSON:  You just asked about her

7    hysterectomy.

8                 MS. FEENEY:  I did not.

9    Read the question back, please.

10                (Last question was read.)

11                THE WITNESS:  He said I wasn't right.

12         Q.     (By Ms. Feeney) Mr. Labatte said you

13   weren't right, referring to your mental illness?

14         A.     Yes.

15         Q.     When did he say that?

16         A.     I don't know the dates.  Years ago.

17         Q.     Years ago?

18         A.     Yes.

19         Q.     What else did Mr. Labatte or anyone say

20   about your mental disability?

21                MS. JOHNSON:  Objection to form.

22                MS. FEENEY:  Hold on.  What about my

23   form is a problem?

167

1             MS. JOHNSON:  Or it's conjunctive.

2             MS. FEENEY:  I'll happily rephrase it.

3        Q.    (By Ms. Feeney) What did Mr. Labatte

4   say about your mental disability besides you weren't

5   right?  Anything else?

6        A.    Not that I can think of right now.

7   Nothing's --

8        Q.    Did anybody else at DeMoulas ever make

9   a comment about your mental disability at any time?

10        A.    Yeah.  It was like a joke to them.

11        Q.    Who specifically and when?

12        A.    I don't remember names and I can't

13   think of anything.

14        Q.    You had your hysterectomy in March of

15   2016; is that correct?

16        A.    Yes.

17        Q.    Did you tell anyone at DeMoulas that

18   you were having a hysterectomy?

19        A.    Yes.

20        Q.    Who did you tell?

21        A.    Mr. Labatte, the produce manager at the

22   time, Paul Wood, coworkers.

23        Q.    Did Mr. Labatte ever make any comments

1    about your hysterectomy?

2          A.     Yes.

3          Q.     What did he say and when?

4          A.     "What are you good for now?"

5          Q.     When did he say that?

6          A.     I don't know.  Around the time after

7    the hysterectomy, I believe.

8          Q.     So sometime in, what, April or so, or

9    May of 2016?

10         A.     Somewhere in 2016.

11         Q.     Well, I want to know, was it close in

12   time to the hysterectomy, which was March of 2016?

13         A.     Yes.  It was in 2016 around the

14   hysterectomy.

15         Q.     Okay.  Can we agree it was sometime

16   between March of 2016 when you had your surgery and

17   when you came back in April or May?

18         A.     No.  Because it could have been

19   August.  I don't know.

20         Q.     Well, that's my question.

21         A.     There was plenty of comments.

22         Q.     Not my question.  When did he make the

23   comments?

169

1        A.      In 2016.

2        Q.      But you don't know when.

3        A.      No.

4        Q.      Did he make it more than once?

5        A.      That statement, I think he said it

6   once.

7        Q.      Okay.  Did anyone else make any

8   comments about your hysterectomy besides Mr. Labatte?

9        A.      No.

10       Q.      Did Mr. Labatte make any other comments

11  about your hysterectomy other than the one you just

12  told me about?

13       A.      Who would want me now.

14       Q.      When did he say that?

15       A.      After the hysterectomy in 2016.  I do

16  not know the month.

17       Q.      On how many occasions did he say that?

18       A.      A couple.

19       Q.      More than two?

20       A.      About two.

21       Q.      Was anyone present when he made the

22  comment, Who would want you now?

23       A.      No.  But the other one there was

194

1         Q.      You understood that the company had an

2    anti-harassment policy; correct?

3         A.      Yes.

4         Q.      And each year you would sign that you

5    received and understood the policy.  I can bring the

6    documents out.  But to save time, I'd just like to

7    know if you recall that.

8         A.      Yes.

9         Q.      All right.  And yet despite knowing

10   about the anti-harassment policy and being aware of

11   it, you chose not to tell anyone about Mr. Labatte's

12   comments to you; is that accurate?

13                MS. JOHNSON:  Objection to form.

14                THE WITNESS:  I did tell a few people.

15        Q.      (By Ms. Feeney) Did you tell any

16   supervisors?

17        A.      No.

18        Q.      Paragraph 19, you indicate that you

19   told Jerry Paquette on several occasions about

20   comments that Mr. Labatte has made.

21                When did you tell Mr. Paquette?

22        A.      When he made them and I don't know

23   when.

207

1          A.     Yes.

2          Q.     All right.  You got a letter

3    terminating your employment when you didn't return

4    to work on January 23rd; correct?

5                 MS. JOHNSON:  Objection to form.

6                 THE WITNESS:  Yes.

7          Q.     (By Ms. Feeney) Tell me what happened

8    on March 6th when you reported into work.

9                 MS. JOHNSON:  Are you done with this

10   one?

11                MS. FEENEY:  Well, I might go back to

12   it.

13                MS. JOHNSON:  Oh, okay.

14         Q.     (By Ms. Feeney) Just tell me what

15   happened on March 6th when you went in.

16                MS. JOHNSON:  So you don't need to look

17   at this.

18         Q.     (By Ms. Feeney) You don't need to look

19   at that to give me the answer.  Put that aside and

20   just listen to my question.

21         A.     I did.  I was getting ready to tell

22   you.

23         Q.     Okay.

1          A.      I went into work before six o'clock

2     waiting for Mr. Labatte to show up.  Talked to

3     Linda -- sorry.  I punched in and then I waited for

4     him to show up.  He came in, looked at me and said,

5     "Why do you think you have a job?"  Then he went

6     upstairs, so I followed him upstairs.

7               Then we talked and he said he didn't

8     get any information on me.  He didn't know if I was

9     alive or dead, and that he would -- well, he was very

10    short -- he'd have to speak to Shea, and he would get

11    in touch with me later to come back and have a

12    meeting with Shea.

13         Q.      Okay.  Did another meeting take place?

14         A.      Yes.  I came back -- he had called me

15    -- Mr. Labatte had called me and told me to be back

16    at the front of the store at 3:30 that day.

17         Q.      And tell me what happened then.

18         A.      Mr. Shea, Mr. Labatte, me and a girl in

19    the office started -- them two went out into the back

20    office.  I was at the courtesy booth.  The girl from

21    the courtesy booth said, We're supposed to go down.

22    When we got in there, the girl in the courtesy booth

23    just sits there and tells all the stores all the

1    information.

2              So I had asked, "Can I have somebody

3    else in this office with us?"

4              And he said, "Who?"

5              And I said, "Crystal," because she's

6    POS.  They use her a lot to be sitting in offices for

7    a witness to be in conferences or in meetings.

8         Q.    Okay.

9         A.    So she had come in and then Mr. Shea

10   had said to me, because of my abandonment, I didn't

11   have a job anymore.

12             And I said, "Out of 72 stores," I

13   think I said, "you don't have one place?"

14             He said, "No.  We've already replaced

15   you."

16             And then I said, "When was I

17   terminated?"

18             He goes, "Sometime last week."

19        Q.    Did you talk to anybody else either on

20   that day or any other day concerning your

21   termination?

22             MS. JOHNSON:  Object to the form.

23             THE WITNESS:  My husband.