UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Jennifer Artesi,
        Plaintiff

v.                                                    1:19-cv-00214-SM

DeMoulas Super Markets, Inc. d/b/a
Market Basket and Dennis Labatte,
        Defendants

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COMES Jennifer Artesi, Plaintiff (hereinafter "Ms. Artesi"), by and through her attorney, Law Office of Leslie H. Johnson, PLLC, and submits her Memorandum of Law in support of Plaintiff's Objection to Defendants' Motion for Summary Judgment, and in support thereof states as follows:

**INTRODUCTION**

Ms. Artesi has filed an Objection herewith, which is incorporated herein by reference.[1]

For the following reasons, Defendants' Motion for Summary Judgment should be denied.

**STATEMENT OF FACTS**

**I.1.    Brief Statement of Disputed (and Undisputed) Material Facts Pursuant
To LR 56.1(b), Supporting Denial of Summary Judgment Motion[2]**

A.    Ms. Artesi was not out of designated FMLA leave time at the time she was fired.

Defendants[3] never designated prior leaves as FMLA time during the 12-month rolling period

---

[1]Ms. Artesi's facts are numbered, and when referred to in the body of the "argument" sections will be referred to as "F:#." References to lettered exhibits are to those attached to Defendant's Memorandum of Law ("D. Mem."). Ms. Artesi's exhibits are numbered. Depositions will be cited by Ex. #; page:line. Ms. Artesi's Affidavit will be referred to as Ex. 1:(par.)#," and "Att." For all attachments to the Affidavit, which are verified in the Affidavit. Sometimes greater detail is provided in the affidavit and/or deposition than herein. Dates will generally be numeric "#/#/## or ##/##/##."

[2]Defendant did not provide a brief statement of undisputed material and genuine facts supporting its motion, and failed to note the many disputed facts, as required by LR 56.1(a). Ms. Artesi lists only the most essential facts in this section and relies on the remainder of 1.2 below to supplement. Ms. Artesi will primarily limit the discussion of undisputed and disputed facts to the ones material to her objection which support denial of Defendants' motion. Ms. Artesi's factual assertions and arguments are for the purposes of this objection and memorandum only, and she reserves her right to make all necessary legal arguments, and raise other pertinent facts, throughout this case.

[3]Defendant DeMoulas Super Markets, Inc. d/b/a Market Basket will be referred herein as DeMoulas; Defendant Dennis Labatte will be referred to herein as Labatte.

prior to 12/29/16. Therefore, Ms. Artesi was not past her 12 weeks of FMLA leave time when she was fired on March 6, 2017. See F:24, 36 (below).

B.      After Ms. Artesi made her need for leave time known after 12/29/16, DeMoulas never entered into an interactive process to discuss a reasonable accommodation of additional leave time for Ms. Artesi, to the extent it was necessary. Ex. 1:34.

C.      Ms. Artesi, or a designee, contacted Defendants at least 10 times after she left work on 12/29/16, provided medical documentation as requested, and generally kept in touch; she did not "abandon" her job. F:34-35 below. Ex. 3, Affidavit of Mona Tardif, Att. C, Chart.

D.      Ms. Artesi was harassed repeatedly on the basis of her disabilities and her gender. See F:12, 13, 14; See Ex. 1:6.

### I.2.     Response to Defendants' Factual Background[4]

1.      Ms. Artesi began employment with DeMoulas in 1988 until her termination in March 2017, a period of approx. 29 years. Ex. 1:41, 42.

2.      While Ms. Artesi took multiple leaves over her 29 years of employment since 2001, each time she took time off for depression, Labatte harassed her almost every time she returned. Ex. 1:6, 7, 10, 11, 12. Furthermore, to the best of Ms. Artesi's knowledge, her leave commencing 12/30/16 was the first one that was ever designated as FMLA. Ex. 1:9, 20.

3.      Admitted she was in a rehabilitation center in 2000, but denied it was designated FMLA leave. Ex. 1:9, Ex. 3:3.

4.      The Schmidt Affidavit and Artesi deposition, as cited, refer only to "leave," not "FMLA leave."

5.      Admitted that Ms. Artesi had leave in 2011, but Ex. B is a notice of rights under

---

[4]Any additional facts Ms. Artesi wishes to raise in these areas will be addressed in a consecutive number, e.g. 1.1, 1.2, etc.

COBRA, not notice of approved leave of any kind, including FMLA. Ms. Artesi never stated her leave in 2011 was FMLA. She understood it to be a leave of absence. In fact, Defendants' attorney did not even refer to it as "FMLA leave" in her questioning. Ex. 4, Jennifer Artesi dep., 116:12-19 and 118:8-118:17.

6.     It is agreed she was on leave due to her 2013 workers' compensation shoulder injury, but Ex. C, like Ex. B, is only notice of COBRA rights, not of approved FMLA leave. Ex. C; Ex. 1:36. While Ms. Artesi thought she may have had FMLA leave for her surgeries, she does not remember any FMLA forms for them and does not believe she had to have her doctor fill out any forms. And, there are no FMLA forms in the personnel file other than in 2017. Ex. 1:9, 20; Ex. 4, 119:7-120:2; and 122:5 to 122:9. Probably, Defendants' counsel refers to these periods only as "leave," because it is apparent there are no FMLA forms in the file for those time periods.

7.     Admitted Labatte referred to Ms. Artesi having mental illness years ago.

8.     Ms. Artesi actually testified that other employees made comments about her mental health, and "It was like a joke to them": not to her. (See citation to record in D. Mem.).

9-11.     Ms. Artesi cannot verify the exact dates of her earlier leave in 2016 for a hysterectomy and then a pulled muscle. Ex. 1:8.

12.     Ms. Artesi remembers 2 comments after her surgery, specifically: (1) "What are you good for now?" which he said in front of 2 other female coworkers; and, (2) "What guy would want you now?" Ms. Artesi took these to be discriminatory on the basis of gender and disability. Ex. 1:10. However, after her 3/26/14 surgery, Labatte made other discriminatory comments based on gender, including "You're all worn out…too old"; "If you had a kid, it wouldn't be right," and on at least a monthly basis, "Good morning ladies. Oh, you too Jenn." Ex.1:7.

3

13.     While Ms. Artesi understood that DeMoulas had an anti-harassment policy, she

never knew it to be enforced, particularly as her supervisor, Labatte, kept making harassing

statements, treated her poorly, and she reported the harassment to 2 managers. Ex. 1:13-14.

14.     Ms. Artesi reported comments to her supervisors, and one of her supervisors told

her about other comments said out of her presence. For example, Ms. Artesi told Mr. Paquette,

Asst. Store Manager, about the comments Labatte made after her hysterectomy around the time it

was said, and she also told Mr. Paquette about comments made at other times [Ex. 4, 194:18-

195:21]; and she told Ms. Barnum (her direct supervisor) that Labatte had said if she "had a kid,

it wouldn't be right," and "What are you good for now?" Ex. 1:5, Ex. 4, 197:1-10. Ms. Barnum

also told Ms. Artesi after she left, that Ms. Labatte had said that Ms. Artesi's husband was using

her for her insurance and that she had so many relationships that she was a "slut." Ex. 1:11; Ex,

2, 196:1-10. "

15.     Ms. Artesi testified that years ago she had asked for time off for a mental

disability if it became necessary. Ex. 4, 160:13-161:1.

16.     The time period this paragraph was about, which Defendants cited, is in 2011

when Ms. Artesi was on a leave and received a COBRA letter only, not FMLA paperwork. Ex. B.

17-18.   Ms. Artesi was in residential medical treatment/rehabilitation starting at Palm

Partners and then was placed at G&G, except for a brief inpatient hospitalization for pancreatitis.

Ex. 1:16, 18. Ms. Artesi's husband immediately notified DeMoulas about the inpatient treatment

(12/30/16), and Ms. Artesi had the FMLA paperwork filled out as soon as it was received. Ex.

1:28-30, Ex. 2:5, Affidavit of John Artesi.

19.     The 1/2/17 medical note from Dr. Yarin, Ms. Artesi's primary care doctor in New

Hampshire, stated "Due to a medical condition, Jennifer is currently in the hospital in the state of

Florida. Her discharge date is unknown at this time. Please allow this letter to serve as notification

for Jennifer to be out of work from this date until further notice." Ex. D. This note was hand-

delivered on 1/3/17 by Ms. Artesi's uncle and given to Mr. Paquette as Labatte was not in the

store tyat day. Ex. 1:26, Ex. 3, Att. D, DeMoulas's answer to Interrogatory 3 (excerpt).

20-21.  It is accurate that Ms. Artesi asked her husband to call work, her manager Mandy,

and tell them that she would not be in. D. Mem. SUF 20-21.

22.     On or about 1/9/17, while in Florida, Ms. Artesi signed a leave request form for

12/30/16-2/6/17. See Ex. 1:10, 30, Att. F, 1/23/17 G & G Healthcare Services fax to Market

Basket Benefits.

23.     The form says she was unable to work, and that she was "needing residential

treatment." D. Mem. SUF:23.

24.     At the time Ms. Artesi started FMLA leave on 12/30/16, she had 12 weeks of

FMLA available because DeMoulas had never designated leave in the middle of 2016 as FMLA

leave. There are no such forms in her personnel file. Ex. 1:9, 20; Ex.3:3.

24.1.  Ms. Artesi states:

If I had known I might lose my job, I more probably than not, would not have gone to
treatment on 12/29/16. I thought I had 12 weeks of leave beginning January 1 of each
new year, not having been given any FMLA notices in 2016 stating that that time period
counted against 12 weeks of FMLA leave. Had I received proper notices, I would have
known before leaving for Florida that I only had one week left and made a different
decision, and/or I could have informed DeMoulas they were wrong because I had not
received any notice that my leaves in the middle of 2016 had been designated as FMLA.
Ex. 1:21

25.     Admitted that the 1/13/17 letter, which Defendants knew she would not get

because she was an inpatient in Florida, and she did not get it until after 2/8/17, stated that her

employment would be at their discretion if she did not return by January 23. However, it also

stated that "[y]our FMLA leave request is approved. **All leave taken for this reason will be**

**designated as FMLA leave."** Emphasis added, as this is important notice, notice which she had never received before for any of her leaves, and stated all leave for this reason was FMLA. Her leave request was through at least 2/6/17, and it stated that she should update her condition after 3 weeks. It also required her to provide a fitness-for-duty form to return and said her return could be delayed until that was provided. Ex. G, DN 16-11, p. 3, Ex. 1:22, 31..

26-29.  Ms. Artesi was an inpatient from on or about 12/29/16-2/8/17 at the rehabilitation facility, except for approximately February 2-4 when she was hospitalized at a regular hospital for pancreatitis. She was an inpatient during this entire time period, and there was no reason to notify DeMoulas of the brief change in facility. Ex. 1:15, 16, 18, 24, 31, 32.

30.     While Ms. Artesi was hospitalized, her husband was collecting the mail, but not opening her mail as that was not his practice and he considered it a crime. He also knew that Ms. Artesi's medical providers were providing information to the employer. Ex. 1:27; Ex. 2:12; Ex. 4, 90:3-91:4. Besides, the employer knew Ms. Artesi was in Florida and not New Hampshire. Ex. 1:29,30, 31, Att. D, 1/2/17 Great Works Family Practice out of work note; Att. E, 1/9/17 fax confirmation of FMLA form; Att. F; Ex.4, 90:3-91:4.

31.     Ms. Artesi was allowed to use her phone when she first arrived at the facility in Florida on 12/30/16 to let her husband know she arrived safely, but she was not allowed to use it again until 1/4/17, after she was transferred to G&G. Ex.1:15, 17, 25; Ex. 4, 110:10-111:9.

32.     Ms. Artesi returned to New Hampshire on or about 2/8/17. Ex.1:16, 24.

33.     Ms. Artesi's husband called DeMoulas on 2/10/17 and spoke with Labatte and informed him that Ms. Artesi had been released from the hospital but not yet released to return to work. He stated that she needed to see her primary care doctor, but she was hoping she could return to work in a couple weeks. Ex. 1:33, Ex.2:7.

6

34-35.  Mr. Artesi had contacted Defendants on 2/10/17, on 2/15/17 Ms. Artesi saw her

doctor, and the doctor's 2/22/17 note was mailed to DeMoulas that date. Ex.1:34. On 2/28/17

Ms. Artesi contacted Defendants to ask if she was on the schedule. Ex. 1:35. Prior to her

termination, Ms. Artesi or her designee had at least 10 communications with Defendants about

her leave. See Ex. 3, Att. C.

36.      Ms. Artesi, who had never had a proper FMLA leave notice before 2017, thought

that she had 12 weeks of leave starting 1/1/17, but also had ample contact with Defendants. Ex.

4, 131:12-19. Because the mid-2016 leaves were never properly designated as FMLA, Ms. Artesi

had 12 weeks of FMLA leave starting 12/30/16. See argument below.

37.      Actually, the 3/1/17 letter and notice did not say Ms. Artesi was terminated, and

the attached "Benefit Continuation Notice" said the following: "[t]his letter is to inform you that

as of [2/8/17], your coverage under the DeMoulas Super Markets, Inc. plans **will be terminating**

because of the following reason: termination." Ex. I (emphasis added). This was a Notice

regarding COBRA, like notices in prior years, e.g., Ex. A, B, C. It was also confusing because it

spoke about a future termination of insurance on a date that had passed.

37.1     Furthermore, in later conversations with Defendants, while trying to save her job,

Ms. Artesi repeatedly asked for clarification of the date she was terminated because she was

never provided a date. Ex. 1:35, 37, 39, 40, 42, 47, 48. Ex. 4, 152:6-11.

38.      Ms. Artesi reported for work on March 6, the date she was actually fired. Labatte

asked her to come to his office and asked why she thought she still had a job, and that they

"haven't heard anything," and "it was disrespectful you didn't call," and that she had

"abandoned" her job, claiming they did "not know if [she]I was alive or dead." These were all

lies. However, as the meeting progressed, Labatte acknowledged he had received all of her

paperwork (referring to her medical records and FMLA paperwork on his desk), including the 1/2/17 doctor note and the 2/22/17 doctor letter stating she could return to work on 3/6/17. Ms. Artesi was then directed to go home and that Mr. Shea, a supervisor, wanted to talk with her and Labatte would call to let her know the time of the appointment. Ex. 1:34, 39.

38.1.    When Ms. Artesi reported to work on 3/6/17, she was approached by co-worker Linda Quint who asked "What happened to you? DJ and I thought you were in rehab." Since only the employees at the main office and Labatte were made aware of the reason for her absence, one of them had to have informed these other workers, which demonstrates they knew of the reason for the absence. Ex. 1:38.

38.2.    When Ms. Artesi spoke to Mr. Shea on 3/6/17, she requested a written termination letter from Mr. Shea on 3/29/17 to clarify the date of her termination, he refused, instead claiming she had "quit." Ex. 1:48. (Also see F:38.4.)

38.3.    At approximately 3:30 PM on 3/6/17, Ms. Artesi met with Mr. Shea and Labatte with Crystal Faucher present as a witness. Mr. Shea stated that because of her lack of communication with the company and taking a lot of time off, including exhausting her FMLA, she no longer had a job with the company. Ms. Artesi told Mr. Shea that she had been in regular contact with the store through submission of medical documentation. Ex. 1:40. Ms. Artesi asked Mr. Shea, "There's no spot for me in 72 stores?" and "After 29 years that's it?" Mr. Shea confirmed the decision was final, and when Ms. Artesi asked when she was terminated Mr. Shea replied, "Sometime last week." Ex. 1:40, 42.

38.4.    On 3/9/17 Mr. Artesi spoke with Mr. DeMmoulas and told him Ms. Artesi was wrongfully terminated, that Labatte claimed she abandoned her job, which was not true; that she was a 29 year senior employee, and that she did not abandon her job, but instead had been very

sick. Mr. Artesi asked Mr. DeMoulas if there was any way she could get her job back, and Mr. DeMoulas stated he would look into it. Ex. 1:43, Ex. 2:8.

38.5.    On 3/10/17, Joseph Schmidt called Mr. Artesi. He stated Mr. DeMoulas asked him to call. Mr. Artesi relayed the same information he had relayed to Mr. DeMoulas and that Ms. Artesi just wanted her job back. Mr. Schmidt told Mr. Artesi he would look into it. Ex. 1:44, Ex. 2:9.

38.6.    On 3/18/17, Ms. Artesi spoke with Mr. Schmidt, reiterating much of what Mr. Artesi had already told her they had discussed, and again asked for her job back. She was told by Mr. Schmidt that he would look into it, that the Produce Supervisor, Michael McGuire was on vacation and he would contact her after he met with that supervisor. Ex. 1:45.

38.7.    On 3/28/17, Mr. Schmidt called Ms. Artesi and stated DeMoulas was not going to take her back. Ex. 1:47.

38.8.    On 3/29/17, Ms. Artesi contacted Tim Shea, and requested a written termination notice to clarify the date of her termination. Mr. Shea refused the request, instead claiming she had quit.

39.    The date of the Charge filing is accurate, however, only the cover page was filed by Defendants. Ms. Artesi sees no reason to add the entire charge at this point as it is duplicative of the complaint.

## STANDARD OF REVIEW

Defendants state the general summary judgment standard. Plaintiff adds that the Court should not decide factual issues but, rather, only decide if factual issues exist. *Lindahl v. Air France*, 930 F2d 1434, 1438 (9th Cir 1991); *Foster v. Swift & Co*., 615 F2d 701, 702 (5th Cir 1980). "Summary judgment in favor of the party with the burden of persuasion…is inappropriate

when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 US 541, 552-53 (1999). It is a fundamental principle that at the summary judgment stage, all reasonable doubts and issues of credibility should be resolved in favor of the non-moving party. *Tolan v. Cotton*, 134 SCt 1861, 1866 (2014); *Rivera-Rodriguez v. Frito Lay Snacks Caribbean, A Division of Pepsico Puerto Rico, Inc.*, 265 F3d 15 (1st Cir 2001). In its role of giving the benefit of every favorable inference to the non-movant, the trial court may not usurp the fact-finding role of the jury by determining credibility, weighing the evidence, or making factual choices. *Hindman v. City of Paris, Texas*, 746 F2d 1063, 1068 (5th Cir 1984).

With regard to the burden at the summary judgment stage as to the prima facie case, various circuit courts have determined that the burden of proof to sustain a prima facie case on a summary judgment motion is not onerous. "There must be a lower burden of proof to sustain a prima facie case than to win a judgment on the ultimate issue of discrimination…." *EEOC v. Avery Dennison Corp.,* 104 F3d 858, 861 (CA6, Ohio, 1997).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 277 US 242, 255 (1986), (citations omitted). In the case at bar, there are significant disputed and undisputed issues of material fact for the jury's determination and Defendants' motion should be denied.

## ARGUMENT[5]

Plaintiff changes the order of the argument for a more logical flow. The FMLA will be

---

[5]Arguments made herein are for the purposes of this objection only.

discussed first (Argument I) because it will be obvious it was violated, as previous leave in 2016 had not been properly designated and Ms. Artesi had not run out of FMLA leave when she was fired 3/6/17. Next, whether or not Ms. Artesi had run out of FMLA leave time, disability discrimination occurred because Defendants did not allow her the reasonable accommodation ("RA") of additional leave time up to 3/6/17, nor discuss it with her (Argument II). Ms. Artesi will then address the hostile environment based on gender and disability as Argument II.C., as they are intertwined; Gender Discrimination as Argument III; Aiding and Abetting of Labatte as Argument IV; and, Retaliation as Argument V.

## I.  (D. Mem. V.) Defendants Violated the FMLA and Terminated Plaintiff Before Her Leave Time Expired

The FMLA was enacted by Congress in 1993, in part to address problems arising from "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 USC §2601(a)(4). It was designed to provide a balance between "entitl[ing] employees to take reasonable leave for medical reasons" and "accomodat[ing] the legitimate interests of employers." 29 USC §2601(b)(1)(2). Defendants interfered with Ms. Artesi's FMLA leave and retaliated against her for taking it, by failing to properly designate FMLA leave in 2016, and firing her before her leave expired. As of 12/30/16, Ms. Artesi, a 29-year employee, still had 12 weeks of leave available to her, and therefore, was not out of FMLA leave at the time she was fired when reporting to work on 3/6/17. F:24, 36. Defendants' argument rests solely on their incorrect assertion that Ms. Artesi had exhausted FMLA leave, and a failure to recognize even if she had exhausted FMLA, additional leave time had to be discussed and offered as a RA under the ADA.

### A.  The FMLA Has Strict Notice Requirements Which Were Not Followed

As noted by Defendants, an employer may not retaliate against an employee for exercising any right provided by the FMLA, such as terminating her. P. Mem., p. 15 (citations omitted). Defendants' failures to abide by the FMLA started well in advance of the termination; it started when they failed to provide appropriate notice on every prior occasion Ms. Artesi took leave.

"When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within [5] business days absent extenuating circumstances." 29 CFR 825.300(b)-Eligibility Notice. The employer also must provide a written rights and responsibilities notice each time the eligibility notice is provided. 29 CFR 825.300(c). The FMLA requires an employer to give an employee whose leave may be covered by FMLA "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 CFR §825.300(c)(1). The regulations also provide that the failure to give required notices of rights "may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 CFR 825.300(e). Notices are to be given on prescribed FMLA forms, e.g., see Ex. E, 16-9. See also Ex. 3, Att. A, DOL Fact Sheet #28D: Employer Notification Requirements under the Family Medical Leave Act; Ex. 3, Att. B, DOL Fact Sheet #77B: Protection for Individuals under the FMLA.  As an example, one court has found:

> Section 825.220(b) of Title 29 of the Code of Federal Regulations provides that '[a]ny violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.' Interfering with the exercise of an employee's rights includes, for example, not only refusing to authorize leave, but discouraging an employee from using such leave. *Id*. Further, 'employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions …' 29 CFR §825.220(c).

*Wahl v. Seacoast Banking Corporation of Florida,* Case 09-cv-81382-KAM, Order on Summary Judgment (SD Fla 2011).

### B.    Ms. Artesi Did Not Receive Appropriate Notice of FMLA Leave in 2016

DeMoulas violated the FMLA on multiple occasions. The undisputed facts demonstrate Defendants did not designate Ms. Artesi's leaves in mid-2016 as FMLA leaves, or notify her of her rights thereunder as required. 29 CFR §825.300 (B)(1). Ms. Artesi never received an FMLA form in her 29 years of employment until she received one to fill out on 1/12/17. Ex. 3:3; ; F:A, 23, 24. Because her leave time in the middle of 2016 was never properly designated as FMLA leave, Ms. Artesi's FMLA leave commencing 12/30/16 should have extended 12 weeks through the end of March 2017.

### C.    Failure to Provide Notice and Prematurely Terminating Ms. Artesi was Retaliation and Interference with her FMLA Rights

A claim for retaliation and interference may exist for failure to give the notices required by the FMLA regulations where that failure results in prejudice to the employee. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 US 81, 90 (2002); *Kosakow v. New Rochelle Radiology Assocs.*, 274 F3d 706, 723-24 (2d Cir 2001). When an employee is terminated for failing to return after 12 weeks of FMLA leave after not having received adequate notice of the employee's FMLA rights and responsibilities, and the employee can establish that with proper notice he would have structured his leave "in such a way as to preserve the job protection afforded by the Act," the employee has a viable claim of interference under the FMLA. *See Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F3d 135, 143 (3d Cir 2004).

By failing to provide proper notifications to Ms. Artesi, her rights to FMLA were interfered with. If she had known she allegedly only had 1 week of leave left, she would have protected her job by either not taking leave or taking a shorter period of time. F:24.1. The lack of

notices two times in 2016 was prejudicial to her; and, even if Defendants had retroactively notified her, which they did not, it would have been contrary to the law, which requires the designation to be made within 5 days.

Because Ms. Artesi was not given proper notice of FMLA leave designations during 2016, her first actual FMLA leave started 12/30/16. In fact, Defendants do not generally refer in their motion to the leaves prior to 12/2016 as "FMLA leave," probably because they now realize proper designation was lacking. Ms. Artesi was fired on 3/6/17, which was prior to the expiration of her leave, for the stated reason that she had exceeded her leave. Despite Defendants' claim, the letter of March 1 was not a termination letter, but a letter about health insurance terminating because she was out more than 8 weeks, with a notice about rights to continue coverage. F:37. Ms. Artesi had received similar letters in the past during leaves, which pertained to health insurance and contributions to premiums. F:5, 6.

Defendants' argument that Ms. Artesi abandoned her job, because she failed to communicate with them is obviously contrary to the facts. Ms. Artesi, and her designees, had contact with Defendants approximately 10 times, and provided all of the information that was requested. F:34-35; Ex. 3:3. Defendants do not even conclusively state when Ms. Artesi was fired, giving at least two different answers, but based on the record it was 3/6/17, when she reported to work. F:37.1. In fact, Defendants admit that when Ms. Artesi showed up for work on March 6, she was told she was terminated. F:38. However, since FMLA leave would have run until the end of March, the termination on 3/6/17 was before expiration of her available leave time and violated the FMLA.[6]

Likewise, Defendants' assertion that there were no negative comments about her leave is

---

[6] Count V is against the individual, Labatte, for aiding and abetting the discrimination.

disputed. Labatte talked about her leave with co-workers, claimed they had not heard from her at all (yet he had the papers on his desk), and made disparaging comments about her medical condition. F:12-14, 38. Also see argument below on hostile environment based on disability, section C.

It is clear Ms. Artesi's FMLA leave had not expired, and she was terminated for taking FMLA leave, all which interfered with her FMLA rights. For the foregoing reasons, and to the extent the Court does not rule that the FMLA was violated based on this record, at a minimum there are disputed issues of material fact supporting denial of summary judgment.

## II.     (D. Mem. I) The Defendants Discriminated Against Plaintiff on the Basis of Disability

Counts I, II and V are for disability discrimination, including harassment/hostile environment, failure to reasonably accommodate, and her termination. Taken in the light most favorable to Ms. Artesi, as the non-moving party, there are genuine issues of material fact which preclude the granting of summary judgment.[7]

### A.      Plaintiff's Termination was Based Upon Disability Discrimination, and a Failure to Provide a Reasonable Accommodation

Defendants generally state the standard for disability discrimination, and admit that failing to provide a RA can be the basis for a discrimination claim, and that they took an adverse job action in terminating her. Defendants solely rely on their assertion Ms. Artesi fails the second element, that she was not able to perform the essential functions of her job with or without RA at the time they fired her, and that she "abandoned" her job. This overlooks (1) that she had, in fact, not run out of FMLA leave as argued above; and (2) even if she had, an additional period of time for leave is itself a RA, which they failed to provide to her, or even discuss as part of the required

---

[7]Defendants indicate that Ms. Artesi has not proven her case; but, of course at this stage, she need only go forward with a *prima facie* case, as cited in the standard of review section.

interactive process. Ex. 1:23. As noted above, Ms. Artesi was not terminated until 3/6/17, when she reported to work. At a minimum, there is a disputed issue of fact regarding the termination date. Defendants' argument also defies common sense, otherwise everyone who goes on FMLA leave would be subject to being fired without a separate individualized RA assessment, as required under the ADA. An employer simply cannot claim that qualifying for FMLA leave, and not being able to perform the essential functions of the job during that leave time, allows the employer to fire the employee without the additional ADA analysis.

There is no serious argument that Ms. Artesi "abandoned" her job, as she had approx. 10 contacts with the employer, and provided all of the information it requested, which is fully articulated in the fact section above. If Defendants' position that she was past her FMLA leave allotment had any merit, they would not need to resort to a claim that she had abandoned her job. Furthermore, the assertion that Ms. Artesi had returned to work after "leaves for medical conditions" in years past is unavailing, though informative since they do not call those leaves "FMLA leaves," and there were not FMLA forms provided to her.

Ms. Artesi had not exhausted all FMLA leave, had kept in contact with her employer on multiple occasions as required; and, told them she would be back to work 3/6/17. Even if FMLA leave had run out, granting her a brief extension of leave time was a required RA under the ADA, as discussed in section B below.

### B.[8]     Defendants Failed to Provide a Reasonable Accommodation Because, to the Extent Necessary, Ms. Artesi was Entitled to Additional Leave Time Under the ADA

If Ms. Artesi was past her 12 weeks of leave, she was entitled to a brief extension of that

---

[8]This responds to Defendants' argument in I.C., that Defendants did not fail to provide an accommodation for Plaintiff's disability. And, section C that follows responds to Defendants' argument in I.B., regarding hostile environment based on disability.

leave as a RA under the ADA. Defendants generally cite some of the applicable ADA law,

including that an extended leave may be required as a reasonable accommodation, and that an

employer's knowledge that an accommodation is needed is equivalent to a specific request. Here,

Defendants admit they were aware of the request for leave time through 2/6/17. SUF:22,23;

F:22, 23.

It is not only "some Courts" that have recognized the requirement of extensions of leave

may be required, but specific regulations and EEOC Guidance. The EEOC Enforcement

Guidance under "Leave" has this to say about additional leave time:

- Does an employer have to hold open an employee's job as a reasonable accommodation?

Yes. An employee with a disability who is granted leave as a reasonable accommodation is
entitled to return to his/her same position unless the employer demonstrates that holding open
the position would impose an undue hardship. (51. See Schmidt v. Safeway Inc., 864 F Supp
991, 996-97, 3 AD Cas (BNA) 1141, 1145-46 (D Or 1994); Corbett v. National Products Co.,
4 AD Cas (BNA) 987, 990 (ED Pa 1995).

If an employer cannot hold a position open during the entire leave period without incurring
undue hardship, the employer must consider whether it has a vacant, equivalent position for
which the employee is qualified and to which the employee can be reassigned to continue
his/her leave for a specific period of time and then, at the conclusion of the leave, can be
returned to this new position. (52. See EEOC Enforcement Guidance: Workers'
Compensation and the ADA at 16, 8 FEP Manual (BNA) 405:7391, 7399 (1996) [hereinafter
Workers' Compensation and the ADA]. See also pp. 37-45, infra, for information on
reassignment as a reasonable accommodation.)

Example: An employee needs [8] months of leave for treatment and recuperation related to a
disability. The employer grants the request, but after [4] months the employer determines that
it can no longer hold open the position for the remaining [4] months without incurring undue
hardship. The employer must consider whether it has a vacant, equivalent position to which
the employee can be reassigned for the remaining [4] months of leave, at the end of which
time the employee would return to work in that new position. If an equivalent position is not
available, the employer must look for a vacant position at a lower level. Continued leave is
not required as a reasonable accommodation if a vacant position at a lower level is also
unavailable.

*https://www.eeoc.gov/policy/docs/accommodation.html#undue,* **Enforcement Guidance:
Reasonable Accommodation and Undue Hardship Under the Americans with
Disabilities Act (Footnote citations from original inserted above).**

Extensions of 8 months or a year have been deemed reasonable by other courts.  As far as "hardship":

Example A: An employee with an ADA disability needs 13 weeks of leave for treatment related to the disability. The employee is eligible under the FMLA for 12 weeks of leave (the maximum available), so this period of leave constitutes both FMLA leave and a reasonable accommodation. Under the FMLA, the employer could deny the employee the 13th week of leave. But, because the employee is also covered under the ADA, the employer cannot deny the request for the 13th week of leave unless it can show undue hardship. The employer may consider the impact on its operations caused by the initial 12-week absence, along with other undue hardship factors.[9]

*Id.*  EEOC Guidance. *See also* 42 USC §12111(9)(B).

In addition, whether or not the requested extension is "reasonable" is an issue of fact for the jury. In this case, there is evidence that the leave had not even expired, but assuming it had by 1/7/17, a 2-month leave should be deemed reasonable. Arguably, since DeMoulas did not send a letter about termination of benefits until 3/1/17 and did not actually tell Ms. Artesi that she was fired until 3/6/17, the only extension needed was, at most, from 3/1/17, less than 1 week.

Whether or not Ms. Artesi had run out of FMLA leave time is strongly disputed. Taking the evidence in the light most favorable to Ms. Artesi, she was entitled to leave until the end of March, but was fired on 3/6/17 during her leave. Assuming that Ms. Artesi was out of leave and actually terminated by an earlier date, Defendants had a duty to enter into the interactive process to discuss reasonable accommodations, which can include additional leave time. Here, the

---

[9] As to the causal connection element for ADA discrimination generally, the *Higgins* case states: under the ADA, 'the term `discriminate' includes…not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability…, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].' 42 USC §12112(b)(5)(A)...Unlike other enumerated constructions of 'discriminate,' this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'-the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability-and no proof of a particularized discriminatory animus is exigible…Hence, an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business. *See* 42 USC §12112(b)(5)(A). *Higgins v. New Balance Ath. Shoe, Inc.,* 194 F3d 252, 258 (1st Cir 1999) (internal citations and footnote omitted).

additional time would only have been between 1 and and 8 weeks. Defendants have not demonstrated either that they entered into the interactive process with Ms. Artesi, or that granting the leave would have caused an undue hardship. Therefore, summary judgment on this claim should be denied.

    C.    **Ms. Artesi Was Subjected to a Hostile Work Environment Based on Disability and/or Gender**

This responds to Defendants arguments I.B, and II.B. pertaining to hostile environment based on disability and/or gender, respectively. They cite the general standard for a hostile environment, that it must be severe or pervasive. Defendants cite *Posteraro v. RBS Citizens Bank,* 2014 US Dist LEXIS at *20-21, in which it is clear the Court was dealing with less than 5 instances of alleged conduct, and not all by supervisors. *See also Billings v. Town of Grafton*, 515 F3d 39, 47–50 (1st Cir 2008) (reversing a grant of summary judgment in favor of employer on a hostile work environment claim where supervisor repeatedly and egregiously stared at a female employee's breasts on many occasions over a multi-year period). *Posteraro* at *17.

Here, Ms. Artesi complains that she was subjected to an actionably hostile environment. *See Madeja v. MPB CORP.*, 821 A2d 1034, 149 NH 371, 380 (NH, 2003). Severe or pervasive harassment is determined by looking at the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Noviello v. City of Boston,* 398 F3d 76, 92 (1st Cir 2005) (quoting *Faragher v. City of Boca Raton,* 524 US 775, 797-98 (1998)). Any combination thereof will suffice. "Title VII also allows a plaintiff to prove unlawful discrimination by showing that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" *O'Rourke* v. City *of*

*Providence*, 235 F3d 713, 728 (1st Cir 2001)*,* (quoting *Harris v. Forklift Sys., Inc*., 510 US 17, 21 (1993)). "Pervasive" indicates an on-going fact pattern.

While the comments to and about Ms. Artesi occurred over several years, they were usually made around the time of medical leaves or her marriage. The fact that they repeatedly occurred makes them pervasive. As to the severity, that is really an issue for the jury.

> Because harassment serious enough to create a hostile work environment often involves a cumulative process in which a series of acts or events mount over time to create an unlawfully hostile atmosphere, the question as to when offensive conduct violates Title VII is often better resolved by the factfinder at trial and not on summary judgment. See *O'Rourke*, 235 F3d at 732. Again, Munroe has introduced sufficient evidence of harassment to satisfy her burden on summary judgment. Whether the conduct that Munroe was subjected to was or at some point over the course of her employment became sufficiently severe or pervasive to support a Title VII harassment claim is best reserved for trial.

*Munroe v. Compaq Computer,* CV-00-379-JM 10/18/02, section B, (DNH 2002). *See also Harris,* 510 US at 22 (There is no "mathematically precise test.")

Harassment need not be "sexual" in nature. See *Hicks*.[10] Because many of the comments made by Labatte concerned both gender and disability, as some of Ms. Artesi's surgeries were gynecological, they should be considered together as intersectional discrimination or "gender plus." For example, Ms. Artesi was told by Labatte in 2014 that:

1. "You're all worn out…Too old," which he said to her one time;
2. "If you had a kid, it wouldn't be right," which he said to her one time; and,
3. "Good morning ladies. Oh, you too Jenn," which he said to her on at least a monthly basis after her 3/26/14 surgery (rendering her infertile).

In the middle of 2016, when Ms. Artesi was out for her hysterectomy, Labatte said:

4. "What are you good for now?", in front of two of her female co-workers; and,

---

[10]The harassment does not have to be "sexual" in nature but may be based on "gender." The EEOC has also set forth guidelines: Although the guidelines specifically address conduct that is sexual in nature, the Commission notes that sex-based harassment-that is, harassment not involving sexual activity or language-may also give rise to Title VII liability (just as in the case of harassment based on race, national origin or religion) if it is "sufficiently patterned or pervasive" and directed at employees because of their sex. *Hicks v. Gates Rubber Co.,* 833 F2d at 1416; *McKinney v. Dole,* 765 F2d 1129, 1138, 37 EPD ¶35,339 (DC Cir 1985).

5.        "What guy would want you now?", which he said to her one time.

And, after Ms. Artesi returned to work after her wedding in September 2016, that:

6.        "You'll always be Tapscott" (her maiden name) which he said one time;
7.        "How long do you think it's going to last? It won't be long." This comment referred to her marriage, which he said one time;
8.        "Poor guy." This comment referred to her husband, which he said one time with her co-workers present;
9.        In addition, after her termination, she was told by her supervisor, Mandy Barnum, that Labatte said:
10.       "Her husband is using her for her insurance"; and,
11.       "She's had so many relationships. She's a slut."

And after the end of her employment, her supervisor, Ms. Barnum, told her Labatte had said during her employment that:

12.       "Ms. Artesi has an alcohol problem";
13.       "I think she's drinking during lunch";
14.       When she had lunch with a male co-worker: "What's up with those two? I think they have something going on";
15.       "I want her gone"; and,
16.       "She's a hypochondriac."

Ex. 1:7, 10, 11 and 12 d.

While not all of the comments are horrendous on their own, or severe, some of them are, particularly being called a "slut," public conversations about an alcohol problem, alleging she was drinking during lunch, that she was having an affair with a co-worker, or she was a hypochondriac which indicated her conditions were all in her head. Certainly, these statements ridiculed and harassed Ms. Artesi based on her disabilities and gender. The fact that they went on for years, even though not constant, makes them pervasive. "Tolerating co-worker retaliation, may constitute adverse employment actions under certain circumstances." *Madeja v. MPB CORP.*, 821 A2d 1034, 149 NH 371, 380 (NH, 2003).

Also, here it is mostly one supervisor/store manager harassing Ms. Artesi, for which the employer is liable. It need not be reported above the supervisor or manager, although here

another supervisor, Ms. Barnum, observed or heard some of it and did nothing to stop it. Plaintiff

believes that a reasonable jury would find that she was subjected to a hostile environment based

on her gender and/or her disability, and these claims should survive summary judgment.

### III.    (D. Mem. II) The Defendants Did Discriminate Against Ms. Artesi on the Basis of Gender with Respect to the Hostile Environment

#### A.    Ms. Artesi Is Not Alleging that Her Termination was Based on Gender

In summarizing her claims in the beginning of her Complaint, she mistakenly referenced

"termination" as part of her gender claim. However, in the gender counts (III and IV), Ms. Artesi

did not make this claim. See Complaint, ¶2, and ¶¶57-64. Her claim is for hostile environment

based on gender and disability, which is discussed in section II.C. above. However, it is

interesting to note that Defendants admit Ms. Artesi has set forth a *prima facie* case, which they

attempt rebutting with only their claim they legitimately fired her after expiration of her leave

and for job abandonment, which Ms. Artesi has refuted elsewhere herein. While Defendants'

admissions may be enough to get past summary judgment on this issue, it is not Ms. Artesi's

claim.

#### B.    Hostile Environment Based on Gender

Please see section II C above, where this is argued combined with hostile environment

based on disability, which is incorporated herein by reference.

### IV.    Labatte Did Aid and/or Abet Disability and Gender Discrimination

Labatte did aid and abet discrimination against Ms. Artesi based on her gender and

disability, including as set forth above, thus creating a hostile environment, which is an illegal

discriminatory practice. In addition, he was involved in the employer terminating her, and the

one who fired her on 3/6/17, and participated in refusing to extend her leave, which would have

been a reasonable accommodation as required under the ADA.  These are illegal discriminatory

practices. F:12, 13, 14, 37.1, 38, 38.3. The employer is also responsible for his actions, as a store manager and supervisor of Ms. Artesi.

All Plaintiff needs to show is that Labatte "aided or abetted";[11] that as aider or abetter he shared an intent to discriminate like the principal offender, or knew of his supporting roll. *Lopez v. Commonwealth,* 463 Mass. 696, 713 (2012) (end citations omitted). Ms. Artesi went up the chain, through Mr. Shea, even to the owner Mr. DeMoulas, and then his second hand, Mr. Schmidt. They all maintained her termination, despite her explanations, more likely than not relying on inaccurate information provided b y Labatte. F: 37.1, 38.1, 38.4, 38.5, 38.8. Furthermore, other than the FMLA leave starting 12/30/16, no prior leave was properly designated as FMLA leave; no forms were provided for doctors to fill out, and no notice of the number of days used was given. As noted throughout this memorandum, Ms. Artesi had not run out of FMLA leave, and Defendants failed to reasonably accommodate her. Summary judgment on the aiding and abetting claim should be denied, as Labatte aided and abetted the discrimination.

## V.     Plaintiff Was Retaliated Against for Taking FMLA Leave, as Well as Requesting Additional Leave Time, a Reasonable Accommodation Under the ADA

Defendants generally cite some retaliation law, but misconstrue the claim, which is interference and retaliation based on her attempt to access her rights under the ADA and RSA 354-A. From the EEOC Guidance, Section 503 of the ADA, 42 USC §12203, provides:

> (a) Retaliation
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> (b) Interference, coercion, or intimidation

---

[11]"Aiding" and "abetting" are both commonly defined as helping, assisting, supporting, and facilitating, etc.

It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm#III._ADA, fn 7.

As the First Circuit has ruled:

This court has previously assumed, without deciding, that simply requesting an accommodation, without filing a formal charge or engaging in other specific behaviors listed in § 12203(a), is nonetheless behavior protected from an employer's retaliation. *Benoit v. Technical Mfg. Corp.,* 331 F3d 166, 177 (1st Cir 2003) ("we shall assume *arguendo* that such behavior on the part of a plaintiff brings him within the ambit of 42 USC §12203(a)."); *Soileau,* 105 F3d at 16. We have reasoned that "it would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge." *Soileau,* 105 F3d at 16. ... We now hold that requesting an accommodation is protected activity for the purposes of §12203(a).

*Wright v. Compusa, Inc.*, 352 F3d 472, 477-78 (1st Cir 2003) (internal citations omitted).

An employee does not have to file a charge of discrimination to be entitled to bring a retaliation claim. It can be any action taken in furtherance of the statutory scheme. Ms. Artesi requested more time than the employer was apparently willing to admit she was entitled to under the FMLA. As discussed above, an extension of leave could be considered a RA request to which she was entitled. Instead of granting it, Defendants failed to enter the interactive process, denied it, and terminated her.

## CONCLUSION

Because Ms. Artesi's FMLA leave time had not expired when she was fired, the Defendants did not consider additional leave time as a RA to the extent it could have been necessary, she was repeatedly harassed on the basis of gender and disability, she was retaliated against for having taken and requested leave, and Labatte aided and abetted the discrimination and retaliated against her along with Demoulas, summary judgment should be denied. There are

24

ample issues of disputed material fact on these issues, which support the denial of summary

judgment to Defendants.

Respectfully submitted,

**JENNIFER ARTESI, Plaintiff**
By her attorney,

Dated: February 10, 2020                            /s/ LESLIE H. JOHNSON
Leslie H. Johnson, Esquire – NHBA #5545
Law Office of Leslie H. Johnson, PLLC
PO Box 265
Center Sandwich, NH 03227
(603) 284-6600
leslie@lesliejohnsonlaw.com

## CERTIFICATION

I hereby certify on this date that I am sending a copy of this document as required by the
rules of court. I am electronically sending this document through the court's electronic filing
system to all attorneys and to all other parties who have entered electronic service contacts
(email addresses) in this case.

/s/ LESLIE H. JOHNSON
Leslie H. Johnson, Esquire