# EXHIBIT 1

# AFFIDAVIT OF JENNIFER ARTESI

I, Jennifer Artesi, of Center Barnstead, New Hampshire, hereby offer the following statement under oath:

1. I am the Plaintiff in the matter of *Jennifer Artesi v. DeMoulas Super Markets, Inc. et al.,* USDC-NH, Case No. 19-CV-214-AJ.

2. My cellular telephone number during all times covered in this Affidavit was 603-833-3868. Attachment A is a true and accurate copy of my cellular phone log for the period covering 3/3/17-4/20/17, redacted to show only calls between my cell number and work.

3. My landline telephone number during all times covered in this Affidavit was 603-269-3258. Attachment B is a true and accurate copy of excerpts from my landline phone log for the period covering 3/1/16-5/31/17, redacted to show only calls between my home number and work.

4. To the best of my knowledge, the phone number for DeMoulas's store located in Somersworth during all times covered in this Affidavit was 603-742-8937.

5. My direct supervisor was Mandy Barnum, produce manager beginning approximately 2016 to the end of my employment. Paul Wood, was the produce manager, and my direct supervisor from approximately 2001-2006 and again from approximately 2013-2016. Dennis Labatte was my store manager during the last 4 years of my employment and during an earlier period of my employment from approximately 2001-2006. Jerry Paquette was the assistant store manager, both of whom were supervisory to me. Timothy Shea was the District Produce Supervisor beginning in the summer of 2016.

6. I suffer from depression. During 2001-2006 while my depression was fairly severe, I would have to call out sick. I informed my supervisor, Paul Wood, produce manager, that I was suffering from depression, and that when my depression was really bad, I would have to call out. Mr. Wood said he didn't like that I was calling out but that he understood. Almost every day after the day I called out sick, Mr. Labatte would be waiting for me at the door or he would come out of his office and follow me to the timeclock. After I punched in, he would follow me to my department, and make comments such as "you're lucky you have a job", and "you don't know how many times I've saved you", which I believe meant he didn't write me up. He was very intimidating, and made comments like, "you're not all right".

7. On or about the 3/26/14, I had to undergo a tubal ligation, due to various complications I was experiencing. Shortly after returning to work, I again began to be subjected to harassment on the basis of disability/perceived disability and gender with comments made by Defendant Labatte, which included:

    a. "You're all worn out…Too old", which he said to me one time;
    b. "If you had a kid, it wouldn't be right", which he said to me one time; and

1

    c.    "Good morning ladies. Oh you too, Jenn.", which he said to me on at least a monthly basis after my 3/26/14 surgery.

8. On or about 3/30/16, I had a hysterectomy which required my absence from work until on or about 05/16/16. Unfortunately, approximately 2 weeks after returning to work, I pulled a muscle at work and was placed back out of work for approximately 2 weeks, and returned to work in mid-June 2016.

9. While I took leave in the middle of 2016 for two different medical conditions, to the best of my knowledge they were never designated as FMLA leave time as I do not recall seeing any notices designating them as such, nor do I recall ever being given FMLA paperwork for my doctor(s) to complete. When I received my personnel file from Defendant Demoulas there was no FMLA paperwork for the 2016 time period (excluding 12/30/16), nor was there FMLA paperwork for earlier periods of my employment, for example notice of my rights or a form for my doctor to fill out.

10. In approximately early June 2016, I was again subjected to harassment on the basis of disability/perceived disability and gender (these comments refer to my surgery) with comments by Defendant Labatte, including:

    a.    "What are you good for now?", which he said in front of two of my female co-workers; and
    b.    "What guy would want you now?", which he said to me one time.

11. On or about 9/18/16, I got married to John Artesi. Upon returning to work after my wedding, Defendant Labatte made more inappropriate comments, including:

    a.    "You'll always be Tapscott" (my maiden name), which he said one time;
    b.    "How long do you think it's going to last? It won't be long." (This comment referred to my marriage), which he said one time;
    c.    "Poor guy." (This comment referred to my husband), which he said one time with my co-workers present;
    d.    In addition, after my termination, I was told by my supervisor, Mandy Barnum, that Defendant Labatte said:
        i.    "Her husband is using her for her insurance"; and
        ii.    "She's had so many relationships. She's a slut."

12. In addition, Defendant Labatte made other inappropriate comments to me, and otherwise discriminated against me based on gender and disability/perceived disability, including:

    a.    Checking my timecard punches while others (both men and women) were knowingly milking the clock, but he would not check theirs;
    b.    Issuing me a warning for not having my hair net on correctly (some hair was hanging out of the net), while other male employees were not even wearing their

   hair nets, which was against company policy, but Defendant Labatte did not speak to them to correct their hair nets.

 c. Attempting to humiliate me by saying, "Put your hair net on. Jerry's not here to impress." (Jerry was another manager); and

 d. I was also informed by my supervisor, Mandy Barnum that Defendant Labatte made the following comments about me towards the end of my employment:

  i. "Ms. Artesi has an alcohol problem";
  ii. "I think she's drinking during lunch;
  iii. When I had lunch with a male co-worker: "What's up with those two? I think they have something going on";
  iv. "I want her gone"; and
  v. "She's a hypochondriac."

 13. Because Defendant Labatte was the Store Manager, I was afraid that if I reported his inappropriate actions that I would lose my job. I did, however, tell Jerry Paquette, Assistant Store Manager, on several occasions what Defendant Labatte said or did to me, as described above. Mr. Paquette would simply shake his head in disgust and/or refer to Defendant Labatte as being very unprofessional.

 14. I also informed Mandy Barnum, Produce Manager and my direct supervisor, what Defendant Labatte said or did to me. Ms. Barnum instructed me to "write stuff down." Even though I reported many of Defendant Labatte's actions and comments to two managers, for example this paragraph and 13 above, Defendant Labatte's inappropriate actions and statements continued, apparently neither manager nor Demoulas addressed nor corrected Mr. Labatte's actions.

 15. On or about 12/29/16, I was hospitalized for a medical condition/alcoholism, which I believe constitutes a disability. I was not permitted to have or use a telephone or to contact anyone outside of the hospital except for the one call I made to my husband in the early morning hours of 12/30/16. The next time I was allowed to use a telephone was 1/4/17.

 16. I was in the following treatment facilities during the time period covering 12/29/16-2/8/17:

  12/29/16-01/04/17 Palm Partners, West Palm Beach, FL (no calls/no visitors allowed)
  01/04/17-02/02/17 G&G, Miami
  02/02/17-02/04/17 Hospital in Miami FL – pancreatitis
  02/04/17-02/08/17 G&G, Miami FL
  02/08/17 Returned home in NH

 17. I was not allowed to make calls from 12/30/16-1/4/17, except for the one call I made to my husband in the early morning hours of 12/30/16, wherein I asked him to call work.

3

18. I was transferred from the rehabilitation facility (G&G) on February 2, 2017 to a hospital for treatment of pancreatitis. Immediately upon my discharge from the hospital on February 4, 2017, I returned to the rehabilitation facility. Because this was effectively continuous treatment for the same condition, or inpatient hospitalization, I did not believe it was necessary for me to inform DeMoulas of the brief change in facilities.

19. I signed a leave request form for the period covering December 30, 2016 – February 6, 2017, which had been provided to me by Demoulas. They did not provide any other forms to have filled out, even after my husband called them on February 10th to tell them I was back but not ready to work and would be seeing my doctor.

20. During my deposition, I thought Attorney Feeney was stating a fact that my March 2016-June 2016 leaves were FMLA leaves, however, in reviewing my personnel file I see it was not FMLA leave, nor do I remember anyone ever telling me any of the earlier leaves were FMLA leaves.

21. If I had known I might lose my job, I more probably than not, would not have gone to treatment on 12/29/16. I thought I had 12 weeks of leave beginning January 1 of each new year, not having been given any FMLA notices in 2016 stating that that time period counted against 12 weeks of FMLA leave. Had I received proper notices, I would have known before leaving for Florida that I only had one week left and made a different decision, and/or I could have informed DeMoulas they were wrong because I had not received any notice that my leaves in the middle of 2016 had been designated as FMLA.

22. The January 13, 2017 letter, which DeMoulas knew I would not get because I was an inpatient in Florida, stated that my employment would be at their discretion if I did not return to work by January 23. However, it also stated that "[y]our FMLA leave request is approved. **All leave taken for this reason will be designated as FMLA leave."** Emphasis added, as this is important notice; notice which I had never received before for any of my leaves, including the ones in the middle of 2016. I also had requested leave through at least February 6, which the letter said was approved. The notice also stated that "[p]rovided that there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: 1 week from 12/30/2016". It also required me to provide a fitness-for-duty form to return, and said my return could be delayed until that was provided. Attachment C, 01/13/17 DeMoulas letter

23. After I made my need for leave time known after 12/29/16, Defendant Demoulas never entered into an interactive process to discuss a reasonable accommodation of additional leave time. Demoulas could have sent a letter to me in Florida, faxed to my inpatient facility or called the facility to leave a message.

24. I was discharged from my hospitalization in Florida on February 8, 2017 and returned home on February 8, 2017.

4

25. On or about late December 29, 2016 or early December 30, 2016, I was allowed to call my husband, John Artesi, and I requested that he call work to let them know I was hospitalized, and my understanding is that he did so.

26. My understanding is that on or about January 3, 2017 my uncle, Gary Arkerson, picked up a note at my doctor's office regarding my absence, and hand-delivered it to work. Said doctor's note confirmed I was hospitalized and that my discharge was unknown. See Attachment D which is a true and accurate copy of the 01/02/17, David Yarian, MD note.

27. I did not instruct my husband to open my mail while I was hospitalized between 12/30/16-02/08/17. It has always been our practice that whomever retrieves the mail, that person sorts it and makes a pile of the other's mail on the counter for them to open themselves. Neither of us opens the other's mail.

28. On or about 01/04/17, Jeannine Miller, my case worker at the hospital where I was an inpatient (G&G), told me she contacted Rachel Joyce in HR at Demoulas and requested FMLA paperwork on my behalf, and that everything was all set.

29. On 01/09/17, Ms. Joyce faxed to Ms. Miller a letter dated 01/09/17 with the blank FMLA forms to complete. I did not see the 01/09/17 letter, nor was it discussed with me by Ms. Miller. Attachment E, is a true and accurate copy of the fax confirmation, 01/09/17 letter from DeMoulas, and blank FMLA form which are contained in my personnel file.

30. My doctor in Florida completed the FMLA paperwork and submitted it to Demoulas via fax on 01/12/17. The FMLA paperwork indicated I would be out of work from 12/30/16 to 02/06/17. It was clear from both the fax cover sheet and the FMLA paperwork that I was hospitalized in Florida. Attachment F, is a true and accurate copy of the 01/12/17 fax confirmation, and completed FMLA form dated 01/12/17, which are contained in my personnel file

31. On or about 01/13/17 Demoulas (Ms. Joyce) apparently wrote a letter to me informing me that I had to be back to work by 01/23/17. However, I did not receive the letter because I was still in the Florida hospital, and I was not expected to be released until on or about 02/06/17 pursuant to the FMLA paperwork that had been submitted via facsimile to DeMoulas (Ms. Joyce) on 01/12/17. (See Attachment G). Demoulas, through Ms. Joyce, was aware I was in Florida because that is where my paperwork was going to and from.

32. I was not discharged from the facility (G & G) until 2/08/17.

33. On 2/10/17 I asked my husband to call Demoulas to update them on my status. I was afraid to call because I knew I would have to speak with Mr. Labatte, and I was afraid I was still too sick to handle his usual caustic demeanor. My husband called with me sitting beside him. I overheard my husband state that I had been released from the hospital but not yet been released to return to work; that I was going to have a follow-up with my doctor and that we would let him know when I could return to work. When he got off the phone, my husband told

5

me he spoke with Mr. Labatte and that Mr. Labatte said he had not heard anything from me for 8 weeks and had no idea what was going on, which I knew was not true.

34. On or about 2/15/17, at a follow-up appointment with my doctor, I was released to return to work effective 3/06/17 which release was not prepared by my doctor until 02/22/17, and was then immediately mailed to Demoulas by my doctor's office. See Attachment H, a true and accurate copy of the 2/22/17 note from David Yairan, MD.

35. On or about 2/28/17, I called Demoulas from my cell phone, and spoke with Mr. Paquette to find out when I was scheduled to work. Mr. Paquette stated he believed I was on the schedule but that I would need to speak with Defendant Labatte to confirm. Given the hostile manner with which Defendant Labatte treated me, I decided to come in to work on 03/06/17, the date my doctor released me to return to work, for which Demoulas would already have the paperwork from my 02/15/17 doctor's appointment.

36. Sometime shortly after 3/01/17, I received a letter dated 3/01/17 from Demoulas stating my health insurance, life insurance, and dental insurance had all been terminated effective 2/18/17. I had received notices like this before about health insurance when I was out on leave, and Mr. Paquette had told me he thought I was on the upcoming schedule.  For example, see Attachment I hereto, a true and accurate copy of my notices of 08/08/13 regarding health insurance. Up to the present time, I am not aware of my actual termination date.

37. On 03/03/17, because my insurances were canceled, I called Demoulas and spoke with Betsy Pellitier/HR, asking her why my insurances had been canceled. Ms. Pellitier directed me to contact my supervisor. I then asked, "Did I get fired?", to which Ms. Pellitier again directed me to contact my supervisor.  This was the first time I thought maybe I had been fired.

38. On or about 03/06/17, after coming in to work, I was approached by Linda Quint, a co-worker, who asked, "What happened to you? DJ and I thought you were in rehab."  Since only the employees at the main office and Defendant Labatte were made aware of the reason for my absence, one of them had to have informed Ms. Quint and Mr. James that I was at a facility.

39. On or about 03/06/17, shortly after I punched in for work, Defendant Labatte asked me to come with him into his office. Once in the office, Defendant Labatte asked me why I thought I still had a job, and that "we haven't heard anything," "it was disrespectful you didn't call," and that I had "abandoned" my job, claiming they didn't know if I was alive or dead. However, during the meeting, Defendant Labatte acknowledged he had in fact received all of my paperwork (referring to my medical records and FMLA paperwork on his desk), including the 01/02/17 doctor note and the 02/22/17 doctor letter stating I could return to work on 03/06/17. I was then directed to go home and that Tim Shea, a supervisor, wanted to talk with me and Defendant Labatte would call to let me know the time of the appointment.

40. At approximately 3:30 PM on 3/06/17, I met with Mr. Shea and Defendant Labatte with Crystal Faucher present as a witness. Mr. Shea stated that because of my lack of communication with the company and taking a lot of time off, including exhausting my FMLA, I

6

no longer had a job with the company. I told Mr. Shea that I had been in regular contact with the store through submission of medical documentation.

41. I believe Defendant Labatte had been withholding information from Mr. Shea; and, because Mr. Shea had only begun working as District Produce Supervisor for the Somersworth store since the Summer of 2016, he had not had many dealings with me to know that I was a loyal, hard-working employee of 29 years.

42. On 3/6/17 I asked Mr. Shea, "There's no spot for me in 72 stores?" and "After 29 years that's it?" Mr. Shea confirmed the decision was final. I then asked when I was terminated to which Mr. Shea replied, "Sometime last week".

43. Still in shock that I was actually terminated, my husband tried calling the owner of the company, Mr. DeMoulas, on 3/06/17 and left a message. It is my understanding that Mr. Demoulas returned his call on 3/09/17. My husband told me that Mr. DeMoulas stated he would look into it.

44. On 3/10/17, while I was in our vehicle with my husband driving back to our house, Joseph Schmidt called my husband. I believe he works under Mr. Demoulas. I heard my husband explain what had happened, that I had been out due to a hospitalization and that we had kept Demoulas informed, and that I simply wanted my job back. After the call ended my husband told me that Mr. Schmidt said he would look into it.

45. On 3/18/17, I spoke with Mr. Schmidt, reiterating much of what my husband had already told me they had discussed, and again asked for my job back. I was told by Mr. Schmidt that he would look into it, that the Produce Supervisor, Michael McGuire was on vacation and he would contact me after he met with that supervisor. (See Attachment A)

46. I believe it was not until about 03/18/17 that Mr. Shea, the District Produce Manager, for the first time, asked Mr. James whether in fact my husband had contacted him on 12/30/16 about my being hospitalized and he affirmed the contact had occurred. Therefore, there apparently was not an investigation prior to this.

47. On 03/28/17, Mr. Schmidt called me and stated they were not going to take me back. (See Attachment A).

48. On 03/29/17, I contacted Demoulas, spoke to Tim Shea, and requested a written termination notice to clarify the date of my termination. Demoulas refused the request, instead claiming that I quit. (See Attachment A).

49. It should be noted that it is almost impossible to be fired from a Demoulas store. I have personally observed during my 29 years of employment with Demoulas that Demoulas routinely keeps people employed who missed many shifts without calling in. I can think of one where I believe the person missed up to half of their shifts, but was not terminated.

7

50. In my experience as an employee of Demoulas, there is almost always work to do and when people are out, others take out the slack, they are also usually hiring people.

51. Every year Demoulas gives a March bonus to each of its employees. I was entitled to approximately $4,000 in bonuses which I never received, presumably because I was purportedly terminated prior to 03/01/17, although Demoulas refused to give me a date of termination.

**FURTHER AFFIANT SAYETH NOT**

                                                /s/ JENNIFER ARTESI
                                                Jennifer Artesi

STATE OF NEW HAMPSHIRE
COUNTY OF CARROLL, SS.

Personally appeared Jennifer Artesi, on this 9th day of February 2020 and affirmed that the above facts are true and accurate to the best of her knowledge and belief.

Before me,

                                                /s/ MONA J. TARDIF
                                                Justice of the Peace/Notary Public
                                                My Commission expires:   06/21/22