Ex. 4

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
************************
                       *
JENNIFER ARTESI f/k/a  *
JENNIFER TAPSCOTT,     *
         Plaintiff,    *
                       *
     vs.               *  Docket No.:
                       *  1:19-CV-00214-AJ
DEMOULAS SUPER         *
MARKETS, INC., d/b/a   *
MARKET BASKET and      *
DENNIS LABATTE,        *
         Defendants.   *
                       *
************************
```

DEPOSITION OF JENNIFER ARTESI

Deposition taken by agreement at the Fox Hill Farm, 333 Holderness Road, Center Sandwich, New Hampshire, on Thursday, November 7, 2019, commencing at 10:10 a.m.

Court Reporter:  Sharon R. Fagan, LCR, RPR
                 N.H. Licensed Court Reporter
                 No. 64

```
 1   speak to anybody at your place of employment?
 2         A.    No.
 3         Q.    Who was getting your mail while you
 4   were an inpatient at Palm Partners?
 5         A.    John.
 6         Q.    Your husband.
 7         A.    My husband.
 8         Q.    And who was getting your mail while you
 9   were an inpatient at G & G?
10         A.    My husband.
11         Q.    Had you left instructions when you
12   spoke to John after you transferred from Palm
13   Partners to G & G to make sure that he was opening
14   your mail?
15         A.    No.
16         Q.    Did you expect that he would open your
17   mail since you were continuing --
18         A.    No.
19         Q.    Let me finish.  Did you expect that he
20   would be opening your mail since you were continuing
21   on in inpatient care?
22         A.    No.
23         Q.    Did you instruct anyone, Marc Plante or
```

1  anybody else, to open your mail while you were an
2  inpatient in each of the two facilities?
3      A.    No.
4      Q.    During the time you worked at
5  Market Basket, did you ever have any written or
6  verbal warnings about your performance?
7      A.    I believe I had two.
8      Q.    Can you tell me approximately when they
9  took place and what they involved?
10     A.    The first one was in the Lee store.
11 I'm not sure of the date at the time. And it was
12 because I didn't put my hat on my head when I started
13 work, so I got written up for not putting my hat on
14 my head.
15     Q.    Any others? You said you recall two.
16     A.    Another one when I was at Somersworth.
17 I don't know the date, but it was Mother's Day and I
18 was getting sick. So when I said I had to go home,
19 my produce manager said to me, "Well, then, don't
20 come back without a doctor's note."
21     So the next day, I didn't come in
22 because I went to the doctor's. So when I showed up
23 Tuesday, I got in trouble for not showing up Monday,

```
 1   leave.
 2        A.    I didn't have anybody --
 3        Q.    I'm not being -- it's not judgmental.
 4        MS. JOHNSON:  Can she finish her
 5   answer?
 6        (By Ms. Feeney) Just tell me, you chose
 7   to stay, not to leave.
 8        A.    Yes.
 9        Q.    Okay.  That's fine.
10              So from January 18, 2017 to
11   January 28, 2017, you had what you've described as
12   this outpatient status, but you didn't have anyplace
13   to go to stay, so you stayed there; correct?
14        A.    Yes.
15        Q.    Did the privileges that you had change
16   during the time that you had self-help outpatient
17   status?
18        A.    No.  You also were allowed to leave to
19   go to AA meetings off the premises, but other than
20   that, no.
21        Q.    Could you use the phone?
22        A.    Yeah.  We were allowed to use our
23   phone.
```

1     Q.    A cell phone that you brought in?

2     A.    Yes.

3     Q.    So that if we're fortunate enough to get those phone records that we were talking about earlier, we would see calls if you used the phone during this period of outpatient status from January 18, 2017 to January 28, 2017, if you made them.

9     A.    Yes.

10     Q.    If I can just have you look at JA-43 again, please. And the dates on that outpatient self-help care are January 18, 2017 to February 1st, 2017.

14     Do you see that?

15     A.    Yes.

16     Q.    So if we are reading JA-43 and JA-44 together, you had this period of outpatient status from January 18th, 2017, all the way to February 1st of 2017; correct?

20     A.    Yes.

21     MS. FEENEY: Can you mark that in the record, please?

23     Q.    (By Ms. Feeney) I will be able to

1  Five and six.  All right.  I just don't have a copy
2  of 5.  I just want to make sure I know what we're
3  talking about.
4           So just look at each page.  You don't
5  have to read the whole thing.  Just see if it looks
6  familiar.
7       Q.    (By Ms. Feeney) All I want to know
8  is -- it's substantially similar to the one I just
9  had marked as Exhibit 5.  This is a different year,
10 June of 2011 -- does this look familiar to you?
11      A.    Yes.
12      Q.    This is something you would have
13 received as part of your leave of absence when you
14 were at Market Basket; correct?
15      A.    Yes.
16      Q.    Do you remember what you took the leave
17 of absence for in 2011?
18      A.    Shoulder repair.
19      Q.    Shoulder repair.  Right or left?
20      A.    Left.
21      Q.    Had you injured it or was it just
22 something that wore out, or do you recall?
23      A.    It happened at work.  I injured it.

118

1   Q.   Was it -- what was the surgery for?
2   A.   A torn rotator cuff.
3   Q.   But on the left side.
4   A.   Yes.
5        MS. JOHNSON:  Off the record.
6        (Off-the-record discussion.)
7        (Back on the record.)
8   Q.   (By Ms. Feeney) So staying with the
9   time frame of June 2011, you had a torn rotator cuff
10  on the left side that made you be out of work for,
11  what did you say, 12 weeks?
12  A.   11 or 12.
13  Q.   Okay.  Fair enough.  Some period of
14  weeks.  And you were on leave for that and you
15  received these letters as part of it; is that
16  correct?
17  A.   Yes.
18  Q.   And was the torn rotator cuff something
19  that was a work-related injury?
20  A.   Yes.
21  Q.   All right.
22       (Artesi Exhibit No. 7 was
23       marked for identification.)

1    Q.    (By Ms. Feeney) I'd like to show you
2 what we've had marked as Exhibit 7, again, letters
3 concerning benefit continuation notices.  This time
4 frame is August of 2013.
5         MS. JOHNSON:  So look at each page so
6 you know what you're looking at.
7    Q.    (By Ms. Feeney) What caused you to be
8 out of work in August of 2013, do you recall?
9    A.    I tore my bicep on my left shoulder.
10   Q.    Was that a work-related injury?
11   A.    Yes.
12   Q.    Did you have to have surgery?
13   A.    Yes.
14   Q.    And how long were you out of work, do
15 you recall?  Just approximately.
16   A.    Does it say?
17   Q.    No.  That's why I'm asking.
18   A.    10, 11 weeks.
19   Q.    Okay.  So a period of time longer than
20 a month or so.
21   A.    Yeah.
22   Q.    And those are the notices that you got
23 as a result of being out on leave in Exhibit 7;

1   correct?
2        A.    Yes.
3        Q.    All right.  Would you take a look,
4   please, at Exhibit 4, Page JA-17.
5        A.    (Witness complied.)
6              (Off-the-record discussion.)
7              (Back on the record.)
8        Q.    (By Ms. Feeney) Are you at Page JA-17
9   on our Exhibit No. 4?
10       A.    Yes.
11       Q.    Okay.  Great.  That is a note from
12  Dover Women's Health taking you out of work from
13  May 24th, 2016 to June 10th, 2016.
14             Do you see that?
15       A.    Yes.
16       Q.    What was the reason you were out of
17  work in May to June of 2016?
18       A.    I had had a hysterectomy done a month
19  or so before.  I came back, I lifted something, I
20  pulled a muscle.  I went to see him, so he wanted me
21  to rest in case anything serious had happened.
22       Q.    How long were you out when you had the
23  hysterectomy?

```
 1   needs to take time off from work, it keeps your job.
 2        Q.    Did you ever make a request for FMLA
 3   leave while you were at Shaw's?
 4        A.    No.
 5        Q.    And you did make requests for FMLA
 6   leave when you worked at DeMoulas; correct?
 7        A.    Yes.
 8        Q.    Do you know on how many occasions?
 9        A.    Probably all my surgeries.
10        Q.    All right.  Do you have an
11   understanding of how much time FMLA provides?
12        A.    12 weeks a year.
13        Q.    12 weeks?  And do you have to earn that
14   or is that an automatic 12 weeks?
15              MS. JOHNSON:  Objection to form.
16        Q.    (By Ms. Feeney) Sure.  You can answer.
17        A.    I'm not sure when you first start how
18   long it would take, but then I think once you're
19   established, I don't know how, but then you're
20   allowed.  I think it's just for full-timers, but I'm
21   not positive.
22        Q.    Do you have to have a doctor help fill
23   out some of that paperwork for FMLA leave?
```

1     A.    Yes.
2     Q.    All right.  Did you and Ms. Miller ever have a discussion about the content of Exhibit 11, that is, that you had only one week allotment of FMLA available?
6     A.    Nope.
7     Q.    Were you aware that your FMLA leave was going to expire, as the letter in Exhibit 11 indicates?
10         MS. JOHNSON:  Objection to form.
11         THE WITNESS:  No.
12    Q.    (By Ms. Feeney) How much FMLA time did you think you had when you started your leave in December of 2016?
15    A.    I thought we had 12 weeks every year.
16    Q.    So beginning in January of 2017, in your mind, you believed you had another full 12 weeks.
19    A.    Yes.
20    Q.    And we can agree that as of the end of 2016, you only had 12 weeks total from January 1 of 2016 to December 30th of 2016.  All you get is 12 weeks; correct?

152

1  in not having any further conversations with anyone
2  from DeMoulas?
3           MS. JOHNSON: Objection to form.
4       Q.  (By Ms. Feeney) You can answer.
5       A.  Yes.
6       Q.  Why then did you call Jerry Paquette on
7  February 28th?
8       A.  I called to find out my schedule.
9       Q.  And what did Mr. Paquette tell you?
10      A.  He said he thought I was on the
11 schedule and to call back and talk to Mr. Labatte.
12      Q.  And did you do that?
13      A.  Nope.
14      Q.  Why not?
15      A.  Because I wasn't going to get on the
16 phone with him.
17      Q.  Why not?
18      A.  Because I assumed he already -- well, I
19 knew he already got the paperwork for when I was
20 coming back, so then I was just going to come in the
21 day I was due back.
22      Q.  So you just assumed you could report
23 for a shift.

1    MS. JOHNSON:  Well, I object to that
2 and we're taking a break.  You can move.
3            (Brief recess was taken.)
4            MS. FEENEY:  Back on the record.
5            (Back on the record.)
6       Q.   (By Ms. Feeney) Ma'am, you had a break.
7  You had a chance to talk to your attorney.  Can you
8  please answer my question?
9            What disability did you suffer from for
10 which you claim DeMoulas did not provide you an
11 accommodation?
12           MS. JOHNSON:  Same objection.
13           THE WITNESS:  My disability is mental
14 disability.
15      Q.   (By Ms. Feeney) Okay.  And on -- when
16 did you request an accommodation from DeMoulas for
17 your mental disability?
18      A.   Are you talking like a written thing?
19      Q.   Anything.  When did you request an
20 accommodation from DeMoulas for your mental
21 disability?
22      A.   Years ago I had requested certain times
23 that I needed to take leave for things like that, if

1  that makes any sense.
2       Q.   Well, I don't know whether it makes any
3  sense or not.
4            Are you saying that DeMoulas failed to
5  accommodate your request for certain times for leave?
6       A.   Well, the environment wasn't right.
7       Q.   I'm not talking about an environment,
8  ma'am. I'm talking about a request that you made for
9  an accommodation that was not honored or granted.
10 What are you talking about?
11      A.   I don't even know how to answer that.
12 I don't know -- the question, if you can specify
13 more. I don't even --
14      Q.   Well, let me try and make it clear.
15 You told me that your disability is a mental
16 disability. Do I have that correct?
17      A.   Yes.
18      Q.   And so as you sit here today, on what
19 occasions did you request an accommodation from
20 DeMoulas for your mental disability? Can you think
21 of any? If you can't, that's fine. I just want to
22 know what it was.
23      A.   I can't think of any.

194

1    Q.    You understood that the company had an
2 anti-harassment policy; correct?
3    A.    Yes.
4    Q.    And each year you would sign that you
5 received and understood the policy.  I can bring the
6 documents out.  But to save time, I'd just like to
7 know if you recall that.
8    A.    Yes.
9    Q.    All right.  And yet despite knowing
10 about the anti-harassment policy and being aware of
11 it, you chose not to tell anyone about Mr. Labatte's
12 comments to you; is that accurate?
13           MS. JOHNSON:  Objection to form.
14           THE WITNESS:  I did tell a few people.
15    Q.    (By Ms. Feeney) Did you tell any
16 supervisors?
17    A.    No.
18    Q.    Paragraph 19, you indicate that you
19 told Jerry Paquette on several occasions about
20 comments that Mr. Labatte has made.
21           When did you tell Mr. Paquette?
22    A.    When he made them and I don't know
23 when.

1    Q.    So as you sit here today, you don't
2  have a recollection of when?
3    A.    Well, 2016, when he was making the
4  comments about the hysterectomy, I told Jerry.
5    Q.    Any other times that you mentioned to
6  Jerry Paquette what Mr. Labatte had said or done to
7  you?
8    A.    I would tell him comments that he said
9  to me.
10   Q.    I would like to know what specifically
11 and when.  You've told me that you mentioned the
12 comment about your March 2016 hysterectomy.
13         What else?
14   A.    The comments about, She's not all
15 right.  You know, He's only using her for insurance.
16   Q.    Did you tell Mr. Paquette about these
17 when they were made known to you?
18   A.    When he said them to me?
19   Q.    Yeah.
20   A.    I didn't run right to him.  But, yes, I
21 told him.
22   Q.    And that's where I'm confused, so let
23 me see if I can unpack this.

197

1      A.    Yes.
2      Q.    All right.  Staying with Paragraph 19,
3 please.  Midway through, it says you also informed
4 Mandy Barnum, the produce manager, and your direct
5 supervisor what Mr. Labatte had said or done to you,
6 and she instructed you to write stuff down.
7           What did you tell Mandy and when?
8      A.    Well, I told her about the comments
9 about -- well, another one, If you had a kid, it
10 wouldn't be right.  What are you good for now?
11          He walks in and he goes in, Hello,
12 ladies.  Oh, you too, Jen.  Those type of comments.
13     Q.    Okay.  And did you take Mandy's advice
14 and keep a list?
15     A.    Yeah.  I wrote a few things down.
16     Q.    Do you still have it?
17     A.    I think I might have -- no, probably
18 not.  I think that's what some of this stuff in here
19 is -- was on.
20     Q.    Let me ask the question again.  Do you
21 still have the list?
22     A.    No.
23     Q.    All right.  Do you know when you told