1

1      UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW HAMPSHIRE
2

3   * * * * * * * * * * * * * * * * * * * * * * *
                                  *
4   JENNIFER ARTESI f/k/a         *
    JENNIFER TAPSCOTT,            *
5           Plaintiff,            *
                                  *
6       vs.                       *   Docket No.:
                                  *   1:19-CV-00214-AJ
7   DEMOULAS SUPER                *
    MARKETS, INC., d/b/a          *
8   MARKET BASKET and             *
    DENNIS LABATTE,               *
9           Defendants.           *
                                  *
10  * * * * * * * * * * * * * * * * * * * * * * *

11              **DEPOSITION OF JENNIFER ARTESI**

12              Deposition taken by agreement

13              at the Fox Hill Farm,

14              333 Holderness Road, Center

15              Sandwich, New Hampshire, on

16              Thursday, November 7, 2019,

17              commencing at 10:10 a.m.

18  <u>Court Reporter</u>:   Sharon R. Fagan, LCR, RPR
                           N.H. Licensed Court Reporter
19                         No. 64

20

21

22

23

1          A.      I'm not sure.

2          Q.      You had availed yourself of FMLA time

3     while you had been at DeMoulas on a couple of

4     occasions; correct?

5          A.      Yes.

6          Q.      All right.  So you had a general idea

7     of what FMLA time meant.  It was time off that you

8     got from the employer.  Sometimes it's paid and

9     sometime it's not; correct?

10         A.      Yes.

11         Q.      And yet you didn't make any request for

12    FMLA time from Shaw's for your shoulder surgery?

13         A.      No, but Shaw's is run different.  Can I

14    explain?

15         Q.      Sure.

16         A.      You have to accumulate time to be able

17    to get certain benefits.  Like, you have to work so

18    much to get an hour of vacation time.  I don't know

19    if that has anything to do with FMLA, but on certain

20    things you can't just get it.  You have to earn

21    things.  And I don't know, but, like I said, I did

22    not look into it.

23         Q.      When you were hired to work at Shaw's

1    Q.    And how did you come to seek treatment

2    with G & G Healthcare Services?

3    A.    When I was in the detox facility, they

4    put people -- I don't know how to explain it -- put

5    people in certain places, different treatment

6    centers, and then I was chosen to go to that one.

7    Q.    Okay.  And what led you to a detox

8    facility?

9    A.    Seeking treatment.

10   Q.    When and for what purposes?

11   A.    December 29th, 2016, for alcoholism.

12   Q.    I'm sorry, what?

13   A.    Alcoholism.

14   Q.    Okay.  And what treatment facility did

15   you first seek care at on December 29th, 2016?

16   A.    I believe it was Palm Partners,

17   P-a-l-m, in West Palm Beach.

18   Q.    Okay.  How did you end up seeking

19   treatment in West Palm Beach for detox as opposed to

20   New Hampshire?

21   A.    A friend of mine had called a number --

22   not sure where he got it -- and got referred to that

23   place, and then they accepted me and flew me down.

56

1      Q.    Who's the friend?

2      A.    Marc Plante.

3      Q.    What caused Marc Plante to get you into

4 -- or help get you into a detox facility?

5      A.    Because I had been thinking about it

6 and I had asked him, and he just went and called,

7 found someplace for me.

8      Q.    All right.  And what is Marc Plante's

9 address?  I don't see him listed as somebody who has

10 knowledge.

11      A.    No, I never thought of him.

12      Q.    Okay.  So what's his address and what's

13 his contact information?

14      A.    He lives in Alton, off the circle.  I

15 don't know the address.

16      MS. FEENEY:  Can you mark that, please?

17      I'll send your attorney a request for

18 the follow-up information.

19      Q.    (By Ms. Feeney) He's a friend, not a

20 healthcare provider?

21      A.    No.

22      MS. JOHNSON:  Objection to form and I

23 guess the answer.  You asked a compound question.

58

1  Florida?

2              MS. JOHNSON:  Objection to form.

3       Q.    (By Ms. Feeney) If anyone.

4       A.    I had spoken to my husband before.

5       Q.    Had your husband made any

6  recommendations for you entering detox?

7       A.    He was calling around.

8       Q.    So walk me through how it happened.

9  What did Marc do and how did you end up in the detox

10 facility in Florida?

11             MS. JOHNSON:  Objection to form.  You

12 can answer.

13             THE WITNESS:  I can?

14             MS. JOHNSON:  Yeah.

15             THE WITNESS:  I was on my way home and

16 it was a blizzard.  I couldn't make it down the road

17 to my residence and I was at the Alton Circle, so I

18 went over to Marc's house.  There I started drinking

19 and then along with that, I was talking about going

20 to a detox facility and saying how much I needed it

21 and wanted it, and he looked the number up and

22 called.

23             Q.    (By Ms. Feeney) And if I wrote it down

60

1    Q.      Was that inpatient or outpatient care?

2    A.      Inpatient.

3    Q.      For how long?

4    A.      Seven days, maybe.

5    Q.      And who was the healthcare provider
6    that you saw?

7    A.      I don't remember.

8    Q.      What led you to seek treatment at the
9    Portsmouth Pavilion in 2000?

10   A.      My drinking was interfering with
11   everyday life.

12   Q.      Were you working at the time?

13   A.      Yes.

14   Q.      And where were you working?

15   A.      DeMoulas Market Basket.

16   Q.      Were you working full-time at that time
17   you entered the Portsmouth Pavilion?

18   A.      Yes.

19   Q.      Did you have to take time off?

20   A.      Yes.

21   Q.      Did you put in for FMLA time?

22   A.      I believe so.

23   Q.      And you were able to take the time and

61

1    then return to work?

2         A.     Yes.

3         Q.     How long were you out of work at that

4    time, do you recall?

5         A.     I don't remember.

6         Q.     Was it longer than the seven days you

7    were an inpatient at the Portsmouth Pavilion?

8         A.     I'm not sure.

9         Q.     What other healthcare providers were

10   you seeing in 2000 --

11        A.     I can't remember.

12        Q.     -- other than Dr. Yarian?

13        A.     I know I had seen -- just before that,

14   I had seen Dr. Schopick in Portsmouth.

15        Q.     Do you know how to spell Dr. Schopick's

16   name?

17        A.     S-c-h --

18        Q.     It's an "S"?

19        A.     Yes.

20        Q.     And what kind of doctor is

21   Dr. Schopick?

22        A.     Psychiatrist.  The one that prescribes

23   the medications.

86

1   we discussed may no longer be with G & G; G & G is

2   another facility.

3          A.      Yes.

4          Q.      And where is that facility located?

5          A.      Miami, Florida.

6          Q.      And why were you admitted to the G & G

7   facility in Miami, Florida, after your stay at

8   Palm Partners?

9          A.      For further treatment of alcoholism.

10         Q.      How long were you there?

11         A.      Until February 8th, 2017.

12         Q.      And you told me that facility is in

13  Miami; is that correct?

14         A.      Yes.

15         Q.      Were you at the same G & G facility for

16  the entire time?

17         A.      Yes.

18         Q.      And when you were discharged from that

19  facility on February 8, 2017, where did you go?

20         A.      I came home.

21         Q.      To New Hampshire?

22         A.      Yes.

23         Q.      To the address you told us earlier in

1   hospital?

2       A.      From the 2nd to the 4th.

3       Q.      All right.  So just two nights?

4       A.      Yes.

5       Q.      And then you went back to G & G?

6       A.      Yes.

7       Q.      What do you think you talked to your

8   husband about for that 30-minute conversation?

9       A.      About what had happened.  When I was

10  probably going to leave G & G.  I don't recall.

11      Q.      You don't have a recollection?  I wrote

12  down that you left G & G on or about February 4th,

13  2017, and it looks like there are a few more calls to

14  your husband.

15          When exactly did you come back to

16  New Hampshire?

17      A.      February 8th.

18      Q.      Where did you stay between when you got

19  out of G & G and when you came back to New Hampshire?

20      A.      At home.

21      Q.      I didn't mean to confuse you with the

22  question.  Let me ask it again.

23          Did you get discharged from G & G and

119

1          Q.      (By Ms. Feeney) I'd like to show you

2     what we've had marked as Exhibit 7, again, letters

3     concerning benefit continuation notices.   This time

4     frame is August of 2013.

5                  MS. JOHNSON:   So look at each page so

6     you know what you're looking at.

7          Q.      (By Ms. Feeney) What caused you to be

8     out of work in August of 2013, do you recall?

9          A.      I tore my bicep on my left shoulder.

10         Q.      Was that a work-related injury?

11         A.      Yes.

12         Q.      Did you have to have surgery?

13         A.      Yes.

14         Q.      And how long were you out of work, do

15    you recall?   Just approximately.

16         A.      Does it say?

17         Q.      No.   That's why I'm asking.

18         A.      10, 11 weeks.

19         Q.      Okay.   So a period of time longer than

20    a month or so.

21         A.      Yeah.

22         Q.      And those are the notices that you got

23    as a result of being out on leave in Exhibit 7;

120

1    correct?

2        A.       Yes.

3        Q.       All right.  Would you take a look,

4    please, at Exhibit 4, Page JA-17.

5        A.       (Witness complied.)

6                 (Off-the-record discussion.)

7                 (Back on the record.)

8        Q.       (By Ms. Feeney) Are you at Page JA-17

9    on our Exhibit No. 4?

10       A.       Yes.

11       Q.       Okay.  Great.  That is a note from

12   Dover Women's Health taking you out of work from

13   May 24th, 2016 to June 10th, 2016.

14                Do you see that?

15       A.       Yes.

16       Q.       What was the reason you were out of

17   work in May to June of 2016?

18       A.       I had had a hysterectomy done a month

19   or so before.  I came back, I lifted something, I

20   pulled a muscle.  I went to see him, so he wanted me

21   to rest in case anything serious had happened.

22       Q.       How long were you out when you had the

23   hysterectomy?

121

1          A.      I'm not sure.

2          Q.      More than a month?

3          A.      I'm not sure, honestly.

4          Q.      All right.  And was it approximately a

5   month before June of 2016?  So was it in March or

6   April of '16?

7          A.      Correct.

8          Q.      All right.  Can you walk me through

9   your understanding of what you needed to do to take

10  leave time when you worked at DeMoulas, whether it

11  was for a day or whether it was going to be for a

12  medical procedure that kept you out for more than a

13  day?  What would you typically have to do?

14         A.      Usually ask first, and then fill out

15  paperwork and send it to the HR person.

16         Q.      So you would request if you were going

17  to take the time off, and then assuming that whoever

18  you requested said okay, and you then would fill out

19  leave paperwork; is that correct?

20         A.      Yes.

21         Q.      Do you understand what FMLA or Family

22  Medical Leave is?

23         A.      If yourself or somebody in your family

122

1    needs to take time off from work, it keeps your job.

2          Q.      Did you ever make a request for FMLA

3    leave while you were at Shaw's?

4          A.      No.

5          Q.      And you did make requests for FMLA

6    leave when you worked at DeMoulas; correct?

7          A.      Yes.

8          Q.      Do you know on how many occasions?

9          A.      Probably all my surgeries.

10         Q.      All right.  Do you have an

11   understanding of how much time FMLA provides?

12         A.      12 weeks a year.

13         Q.      12 weeks?  And do you have to earn that

14   or is that an automatic 12 weeks?

15               MS. JOHNSON:  Objection to form.

16         Q.      (By Ms. Feeney) Sure.  You can answer.

17         A.      I'm not sure when you first start how

18   long it would take, but then I think once you're

19   established, I don't know how, but then you're

20   allowed.  I think it's just for full-timers, but I'm

21   not positive.

22         Q.      Do you have to have a doctor help fill

23   out some of that paperwork for FMLA leave?

1    Q.    Okay.

2    A.    Oh, you want to know --

3    Q.    Everything.  Whether you take it once a

4  year or whether you take it once an hour.

5          Do we have them all?

6    A.    Prilosec.

7    Q.    What is that?

8    A.    For my stomach, acid reflux.

9    Q.    Anything else?

10   A.    No.

11   Q.    All right.  So we just missed Vistaril.

12  All right.  Back to Exhibit 12.

13          So you went to see Dr. Yarian on

14  February 15th.  What was your status of work at

15  Market Basket on February 15th, 2017?

16   A.    I thought I still had a job.

17   Q.    When you returned to New Hampshire on

18  February the 8th, did you call anyone at

19  Market Basket?

20   A.    That day, no.

21   Q.    When was the first time you called

22  someone at Market Basket about your return to

23  New Hampshire?

138

1        Q.    Okay.   And what number does that

2  connect to?   What is that the phone number for?

3        A.    The Somersworth Market Basket.

4        Q.    Somersworth.

5        (Off-the-record discussion.)

6        (Back on the record.)

7        Q.    (By Ms. Feeney) So at 3:06 p.m. on

8  February the 28th, you called the Somersworth

9  Market Basket; is that correct?

10        A.    Yes.

11        Q.    And that's the first time you called

12  your employer after returning to New Hampshire on

13  February the 8th; am I correct?

14        A.    Yes.

15        Q.    And you had seen Dr. Yarian on

16  February the 15th; is that correct?

17        A.    Yes.

18        Q.    So help me understand why Exhibit 12

19  has a date of February 22nd, 2017, on it.

20        Did you ask him for a note while you

21  were there on February 15th?

22        A.    Yes.

23        Q.    And seven days later, he writes

142

1        A.     February 28th.

2        Q.     Okay.  That wasn't my question.  So let

3 me ask it again, so that I'm very clear.

4            We know you got back to New Hampshire

5 on February 8th, because you've testified to that and

6 the medical records reflect that, at least the ones I

7 have thus far.

8            You called the store on February 28th.

9 We've established that; correct?

10       A.     Yes.

11       Q.     My question is, why didn't you call a

12 day or two after you got back?

13       A.     I didn't want -- I didn't want to deal

14 with Labatte.

15       Q.     You already said that.

16       MS. JOHNSON:  Okay.  But that's her

17 answer.  You just asked her why.

18       MS. FEENEY:  But I want to finish this

19 up.

20       Q.     (By Ms. Feeney) You called Jerry

21 Paquette on the 28th, right?

22       A.     Yes.

23       Q.     Why didn't you call Jerry Paquette on

143

1    the 9th or 10th of February?

2          A.      Because it was Friday.  Jerry wasn't

3    there.  And me and my husband were talking about

4    letting them know, so my husband made the phone call

5    so I wouldn't have to -- I was a mess.  I didn't want

6    to get on the phone with him.

7          Q.      Okay.  Let me talk a little bit more

8    about this.

9                  So you didn't want to call the store

10   when you returned.  Do I have that correct?

11         A.      Yeah.

12         Q.      Yet, you called Jerry Paquette on

13   February the 28th, 20 days later; correct?

14         A.      Yes.

15         Q.      My question is, why you didn't call

16   Jerry Paquette five days later or ten days later or

17   six days later?  Why did you wait 20 days to call

18   Jerry Paquette?

19                 MS. JOHNSON:  Objection to form.

20         Q.      (By Ms. Feeney) You can answer.  Why

21   did you wait 20 days to call Jerry?

22         A.      Well, my husband called to inform them

23   I was back, and then I wanted -- once I found out

156

1   your Complaint, please?

2          A.      Okay.

3          Q.      Have you read that?

4          A.      Yes.

5          Q.      It says, and I quote, Paragraph 41,

6   "Upon information and belief, in approximately 2016,

7   another employee had been out of work and extremely

8   exhausted her FMLA leave for both her own medical

9   conditions as well as those of family members,

10  however, she was not terminated."

11                 Who are you referring to?

12         A.      Theresa Gutowksy (phon.).

13         Q.      Do you know how to spell her last name?

14         A.      No.

15         Q.      It starts with --

16         A.      "G" --

17         Q.      "G"?

18         A.      -- "u-t" --

19         Q.      And how did you pronounce it?

20         A.      Gutowsky.

21         Q.      And how is it that you are aware of how

22  much FMLA leave time that Theresa had?

23         A.      Because we had talked.  She had had a