Jennifer Artesi

    v.                                     Case No. 19-cv-214-AJ

DeMoulas Super Markets, Inc.,
d/b/a Market Basket, and
Dennis Labatte

### ORDER

Plaintiff Jennifer Artesi[1] has sued her former employer,
DeMoulas Supermarkets, Inc., d/b/a Market Basket ("DeMoulas"),
alleging that DeMoulas terminated her employment in 2017 in
violation of the Americans with Disabilities Act ("ADA"),[2] the
Family and Medical Leave Act ("FMLA"),[3] and the New Hampshire
Law Against Discrimination ("NHLAD").[4]  Artesi has also sued her
former supervisor, Dennis Labatte, for aiding and abetting
discrimination, in violation of the NHLAD.  Before the court is
defendants' motion for summary judgment (Doc. No. 16), to which
the plaintiff has objected (Doc. No. 18), as well as a reply
(Doc. No. 20) and surreply (Doc. No. 22).  See Fed. R. Civ. P.

---

[1]Plaintiff was known by her maiden name, Jennifer Tapscott
during a portion of the time period relevant to this lawsuit.
For the sake of clarity, the court will use her married name
throughout this order.

[2]42 U.S.C. § 12101, et seq.

[3]29 U.S.C. § 2601, et seq.

[4]N.H. Rev. Stat. Ann. § 354-A.

56.  After reviewing the parties' legal memoranda and voluminous exhibits, the court finds that there are genuine issues of material fact as to plaintiff's claims of failure to accommodate her disability (asserted within Counts I and II) and retaliation (Count VI) under the ADA and the NHLAD, as well as her claim against Labatte (Count V).  Summary judgment is therefore denied as to those claims.  Defendants' motion is otherwise granted.

## I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must "assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case."  Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010) (internal quotation marks omitted).

Where, as here, the plaintiff has the ultimate burden of proof, once the movant has made the requisite showing, she can no longer "rely on an absence of competent evidence, but must

affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Torres-Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007).  That is, the plaintiff "'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which he would bear the ultimate burden of proof at trial." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

As it is obligated to do in the summary judgment context, the court "rehearse[s] the facts in the light most favorable to the nonmoving party (here, the plaintiff), consistent with record support," and gives them "the benefit of all reasonable inferences that those facts will bear."  Noviello v. City of Boston, 398 F.3d 76, 82 (1st Cir. 2005) (internal citation omitted).

## II.  Background[5]

A.  Derogatory comments

Plaintiff worked at DeMoulas from approximately 1990 until her separation from employment in 2017.  Complaint (Doc. No. 1-

---

[5] The court will note additional background facts more specifically related to particular claims in its discussion of those claims.

1) ¶ 8.  During most of the relevant time period, plaintiff worked at the DeMoulas store in Somersworth, New Hampshire, after working at the Rochester, New Hampshire location until 2006.  Id. ¶ 11.

Artesi's transfer followed a verbal dispute with defendant Labatte, who was then a co-worker.  In April or May of that year, Labatte suggested that Artesi had lied about an absence being illness-related.  Following another heated conversation regarding Labatte's comments about Artesi's style of pants, Labatte caused Artesi to be transferred to the Somersworth location.  Id.

Labatte resumed making negative comments toward Artesi when he was transferred to the Somersworth store in 2012.  On his first day at the new location, he asked a manager, in Artesi's presence "How many times does she call in [sick] each week?" Id. ¶ 12.

In 2014, Labatte, by then the Somersworth store manager, made the following comments to Artesi:

-- "You're all worn out . . . Too old," which he said to her one time;

-- "If you had a kid, it wouldn't be right," which he said to her one time; and,

-- "Good morning ladies. Oh, you too Jenn," which he said to her on at least a monthly basis after surgery which rendered her infertile.

Affidavit of Jennifer Artesi ("Artesi Aff.") (Doc. No. 18-2) ¶ 7.

In 2016, after Artesi had been out of work after a hysterectomy, Labatte made the following comments:

-- "What are you good for now?", in front of two of her female co-workers; and,

-- "What guy would want you now?", which he said to her one time.

Id. ¶ 10.

In addition, after Artesi returned to work after her wedding in September 2016, Labatte said the following to her:

-- "You'll always be Tapscott" (her maiden name) which he said one time;

-- Referring to her marriage, "How long do you think it's going to last? It won't be long."

-- Referring to her new husband, "Poor guy," which he said with her co-workers present.

Id. ¶ 11.

And, after her termination, Artesi was told by her supervisor, Mandy Barnum, that Labatte said:

-- "Her husband is using her for her insurance";

-- "She's had so many relationships. She's a slut.";

-- "Ms. Artesi has an alcohol problem";

-- "I think she's drinking during lunch";

-- When she had lunch with a male co-worker: "What's up with those two? I think they have something going on";

-- "I want her gone";

-- "She's a hypochondriac."

Id. ¶ 12.


## B.  Medical Leave

Artesi requested and received medical leave on several
occasions during her employment at DeMoulas.  At issue in this
case is leave she took in December 2016 and January 2017.

In late December 2016, Artesi was admitted to the Palm
Partners residential treatment/rehabilitation center in West
Palm Beach, Florida, where she stayed from December 29, 2016
through January 3 or 4, 2017.  Id. ¶ 15.  On or about December
29 or 30, 2016, Artesi, whose phone access was restricted, was
allowed to call her husband, John Artesi, and asked him to call
DeMoulas to let them know she was hospitalized.  Id. ¶ 17.  John
Artesi phoned DeMoulas on the morning of December 30, 2016.
Affidavit of John Artesi ("John Artesi Aff.") (Doc. No. 18-12 ¶
5.  He informed David James, whom he believed to be his wife's
co-worker, that his wife was very ill, had been
Hospitalized, and would not be in to work.  Id.  Although Artesi
had asked her husband to speak to her supervisor, Mandy Barnum,
James told him that Barnum was not yet at work.  Id.  John
Artesi called back a short time later and spoke again with Mr.
James, who again told him that Barnum was not in yet.  Id.  John
Artesi reiterated that his wife had been hospitalized and would

not be in to work.  Id.  James agreed to relay this information

to Barnum.  Id.  On January 3, 2017, a letter written by one of

plaintiff's treatment providers, Dr. David Yarian of Berwick,

Maine, was delivered to DeMoulas.  Yarian's letter indicated

that Artesi was "currently in the hospital" in Florida with an

unknown discharge date, and that she would be "out of work from

this date until further notice."  (Doc. No. 18-6).

On or about January 4, 2017, Artesi transferred to a

different treatment facility, G&G Healthcare Services in Miami,

Florida.  Artesi Aff. (Doc. No. 18-2) ¶ 16.  Also on or about

January 4, 2017, Jeannine Miller, Artesi's case worker at G&G,

told her she contacted Rachel Joyce in DeMoulas' human resources

department and requested FMLA paperwork on her behalf.  Id. ¶

18.

On January 9, 2017, Joyce faxed Miller a letter with FMLA

forms to complete.  Of particular relevance, the letter states,

"We would like to make you aware, if this is approved leave, you

only have one week of FMLA leave available."  Id. (Doc. No. 18-

7).  Artesi asserts she did not see the letter accompanying the

forms, nor did Miller discuss it with her.  Artesi Aff. (Doc.

No. 18-2) ¶ 29.[6]  Dr. Gonzalo Quesada, a Florida psychiatrist

---

[6]In addition to notifying Artesi that she had only one week
of leave left, the letter indicated that Joyce was responding to
Artesi's request for a medical leave of absence and contained
information regarding DeMoulas' FMLA policy.  It also asked for

7

treating Artesi, completed the FMLA paperwork. Miller faxed the
form and a medical records release signed by Artesi to DeMoulas
on January 12, 2017. Dr. Quesada indicated that Artesi was
unable to perform any of her job functions as a result of
needing residential treatment and would be out of work from
December 30, 2016 to February 6, 2017. (Doc. No. 18-8).

On the following day, January 13, 2017, Joyce mailed
DeMoulas' approval of Artesi's FMLA leave to Artesi's New
Hampshire home. (Doc. Nos. 16-11, 18-9). The cover letter
notes that Artesi's leave "commenced on: December 30, 2016.
The one-week allotment ended on January 7, 2017." (Doc. No. 16-
11). The letter further stated that if Artesi "did not return
to your employment effective: January 23, 2017, the maximum
time limit for this FMLA leave will be expired." Id. Finally,
the letter indicated that Artesi's "employment status with
[DeMoulas] will be at the discretion of the company. Your
position has been maintained during your FMLA leave and your
rights will be exhausted." Id. The approval form itself
indicated that only one week of FMLA leave was allotted to
Artesi's absence, commencing December 30, 2016. Id.

Artesi was hospitalized in Florida at this time and did not
learn of the correspondence from DeMoulas until her return to

---

Artesi to return the form with medical documentation regarding
her illness.

New Hampshire in early February.  Artesi Aff. (Doc. No. 18-12 ¶¶
30-31.  Although her husband collected her mail, it was not his
practice to open it because he considered it to be a crime.  Id.
¶ 27; John Artesi Aff. (Doc. No. 18-12) ¶ 12.

Artesi remained at G&G Healthcare Services until February
8, 2017,[7] at which time she returned to New Hampshire.  Mr.
Artesi phoned DeMoulas on February 10, 2017.  Id. ¶ 7.  He
informed Labatte that Artesi had been released from the hospital
but had not yet been cleared to return to work.  Id.  He also
told Labatte that she was hoping to return to work a couple of
weeks later.  Id.  According to Mr. Artesi, Labatte said he had
not heard anything from Artesi for eight weeks.  Id.  On
February 22, 2017, a letter to DeMoulas from Dr. Yarian
indicated that Artesi could return to work at full capacity on
March 6, 2017.  (Doc. No. 16-12).

On or about February 28, 2017, Artesi called DeMoulas and
spoke with Assistant Store Manager Jerry Paquette to find out
when she was scheduled to work.  Artesi Aff. (Doc. No. 18-2) ¶
35.  Paquette told Artesi that he believed she was on the
schedule but that she would need to speak with Defendant Labatte
for confirmation.  Id.  Given Labatte's prior hostile treatment,

---

[7]Artesi left G&G for a brief time in early February to be
treated for pancreatitis.  Artesi Aff. (Doc. No. 18-2) ¶ 18.

Artesi instead decided to come in to work on March 6, 2017, the date her doctor released her to return to work.  Id.

Shortly thereafter, Artesi received a letter dated March 1, 2017 from DeMoulas indicating that her insurance had been terminated effective February 18, 2017.  Id. ¶ 36.  The letter indicated that the reason for the insurance cancellation was "Termination."  (Doc. No. 16-13).  In response, Artesi contacted Betsy Pelletier in DeMoulas' human resources department.  Artesi Aff. (Doc. No. 18-2) ¶ 37.  Pelletier directed Artesi to contact her supervisor.  Id.  Artesi then asked if she had been fired, to which Pelletier again directed her to contact her supervisor. Id.

Artesi reported for work on March 6, 2017.  She was informed that she had been terminated from employment for abandoning her job after January 23, 2017.  Artesi Aff. (Doc. No. 18-1) ¶¶ 38-41.  Artesi commenced legal action against DeMoulas by filing a charge of discrimination with the New Hampshire Commission for Human Rights on June 22, 2017.  (Doc. No. 16-14).

# III. Discussion

Plaintiff's complaint asserts five counts: disability discrimination/hostile work environment and failure to accommodate, in violation of the NHLAD, the ADA, and the ADA as Amended (ADAAA) (Counts I and II); gender discrimination/hostile work environment, in violation of the NHLAD and Title VII (Counts III and IV); aiding and abetting discrimination, in violation of the NHLAD (against Labatte only) (Count V); retaliation, in violation of the NHLAD and the ADA/ADAAA (Count VI); and violation of the FMLA (Count VII). The court addresses the FMLA claim first, before turning to the remaining counts.

## A. FMLA Violation (Count VII)

Count VII alleges unlawful retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. Artesi asserts that her termination was a response to exercising her right to leave under the FMLA. Complaint (Doc. No. 1) ¶ 75.[8]

---

[8]Claims for violations of the FMLA generally fall into one of two categories: interference or retaliation. See Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 330 (1st Cir. 2005). Interference claims are rooted in the text of the FMLA, which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of" an employee's FMLA rights. 29 U.S.C. § 2615(a)(1). Although her objection to defendants' motion raises the specter of an interference claim, Artesi's complaint alleges only an FMLA retaliation claim. As such, only the latter is before the court. See Asociación de Suscripción Conjunta del Seguro de Responsibilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 53 (1st Cir. 2011) ("A plaintiff may not amend her complaint through argument in a brief opposing

DeMoulas maintains that the decision to terminate Artesi's employment was not based on her use of FMLA leave, but was instead based on her continued absence after her FMLA leave expired. The undisputed record supports DeMoulas' position.

Employees covered by the Family Medical Leave Act are entitled to take up to twelve weeks of qualifying leave in any one-year period. Employees who take FMLA leave are also entitled to be restored to the same position or an equivalent position upon return from leave. Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998). The FMLA also forbids an employer from retaliating against an employee for exercising her FMLA rights. Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014) (citing Henry v. United Bank, 686 F.3d 50, 55 (1st Cir. 2012)).

To establish a claim for unlawful retaliation under the FMLA, Artesi must demonstrate: (1) she availed herself of a protected FMLA right; (2) she was adversely affected by an employment decision; and (3) there was a causal connection between her protected conduct and the adverse employment decision. Id. Here, DeMoulas concedes, for the purposes of this motion, that Artesi has satisfied the first two elements – that she availed herself of a protected FMLA right and that she

_____

summary judgment.") (quoting Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)).

was adversely affected by an employment decision.  Her FMLA
claim thus depends on whether there is trial worthy evidence of
a causal connection between her termination and her taking FMLA
leave.

Artesi can establish the required causal connection by
showing that DeMoulas intended to retaliate against her for
taking FMLA leave.  Id. at 722.  In cases where, as here, the
employee provides no direct evidence of retaliatory intent,
courts rely on the burden-shifting framework established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See
Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 9
(1st Cir. 2012).  Under the McDonnell Douglas framework, Artesi
must first establish a prima facie case of discrimination.
Hodgens, 144 F.3d at 160-61.  If she succeeds in establishing a
prima facie case, the burden shifts to DeMoulas to provide a
non-discriminatory reason for the adverse employment action.  Id.
If DeMoulas satisfies this burden, the burden shifts back to the
Artesi to show that DeMoulas' stated reason for the adverse
employment action was a pretext for discrimination.  Id.

Here, given the temporal proximity between her FMLA leave
and her termination, the court assumes Artesi has met her prima
facie burden.  See Hodgens, 144 F.3d at 165. ("The prima facie
burden is quite easy to meet.").  But Artesi's FMLA case falters
at the next step.  DeMoulas argues that it terminated Artesi's

employment because she exhausted her FMLA leave on January 7, 2017, and did not return to work by the date to which DeMoulas extended it – January 23, 2017.  It supports this assertion with documentation related to Artesi's leave earlier in 2016, (Doc. No. 20-4), when she requested and received FMLA leave on two occasions, totaling eleven weeks, between March and June 2016. In approving the second segment of leave, DeMoulas indicated that her then-current leave entitlement was "up to 5 weeks." Doc. No. 20-4 at 24.  This period of leave lasted four weeks. See Return to Work Letter (Doc. No. 20-4) at 26.

It is undisputed that DeMoulas calculates FMLA leave on a "rolling" twelve-month period measured backward from the date of any FMLA usage.  Thus, it is beyond dispute that the eleven weeks of leave Artesi used in 2016 were properly considered in the annual leave calculation at the time of her request for leave in late 2016 and early 2017.  It is also undisputed that Artesi was notified at least twice that she had one week of FMLA leave remaining, and that an apparent extension of her FMLA leave would expire on January 23, 2017.  In light of these undisputed facts, the court finds that DeMoulas has met its burden of showing a non-discriminatory reason for Artesi's firing.  See Robson v. Shaws Supermarkets, Inc., 411 F. Supp. 3d 58, 69 (D. Me. 2019) (noting that "an employer acts within its

rights if it terminates an employee who fails to return to work
upon the expiration of FMLA leave").

Artesi's attempts to demonstrate that DeMoulas' stated
reason for her termination is pretextual are minimal and
unavailing.  She first asserts that DeMoulas' intent can be
discerned from its decision to send the January 13, 2017 FMLA
notice to her New Hampshire home, when it knew that she was in
Florida.  DeMoulas, however, was unaware that plaintiff's
husband would not open her mail, forward mail from her employer
to her, or contact her or her treatment facility to advise her
that she had received mail from her employer.  Under these
circumstances, mailing the notice to her home is not evidence of
nefarious intent.  Moreover, DeMoulas' January 7, 2017
correspondence, which also noted her expiring FMLA leave, was
sent to Florida, but Artesi claims she didn't see it.  Such an
attempt to whipsaw DeMoulas for sending information to both
Florida and New Hampshire is not a substitute for probative
evidence of retaliation.

Ultimately, Artesi has failed to cite any record evidence
that suggests that DeMoulas' decision to fire her was in
retaliation for taking FMLA leave.  Accordingly, DeMoulas is
entitled to summary judgment on Count VII.[9]

---

[9]While the proximity of her leave to her termination was
enough for the court to assume that Artesi had satisfied her
prima facie burden, proximity, standing alone, does not

## B. Disability Discrimination (Counts I and II)

In Counts I and II, Artesi claims that DeMoulas violated the NHLAD and the ADA by creating a hostile work environment related to her disabilities and by failing to accommodate her disability by providing additional FMLA leave in 2017.[10]  There are two claims subsumed within each count, which the court addresses individually.[11]

---

establish causation.  See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (finding that plaintiff established prima facie case of retaliation under the ADA, but noting that "chronological proximity does not by itself establish causality, particularly if the larger picture undercuts any claim of causation" (brackets and internal quotation marks omitted)); Hodgens, 144 F.3d at 170 ("[T]emporal proximity may give rise to a suggestion of retaliation, [but] that suggestion is not necessarily conclusive." (brackets, citation, and internal quotation marks omitted)).

[10]The parties agree that the analysis of Artesi's claims is the same under the NHLAD and the ADA; thus, the court relies on cases interpreting the ADA to assess both her state and federal claims. See Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277, 288 (D.N.H. 2016); Gallagher v. Unitil Serv. Corp., No. 14-cv-20-SM, 2015 WL 5521794, at *15 (D.N.H. Sept. 17, 2015); see also Madeja v. MPB Corp., 149 N.H. 371, 378 (2003) (relying on cases interpreting federal employment discrimination law to aid interpretation of RSA 354-A).

[11]The court notes that plaintiff's argument in response to defendants' motion has complicated the court's task.  For example, one section of her memorandum of law refers to "hostile work environment based on disability and/or gender."  Pltff. Mem. (Doc. No. 18-1) at 19.  It should go without saying that these are separate claims and should be addressed as such.

1.  Hostile Work Environment

To succeed on a hostile work environment claim based on disability harassment, an employee must show that (1) she was disabled, (2) she was subjected to a hostile environment, and (3) the hostility was directed at her because of her disability. See Quiles-Quiles v. Henderson, 439 F.3d 1, 5 & n.1 (1st Cir. 2006).  The employee must present evidence that the harassment was "sufficiently severe or pervasive so as to alter the conditions of [her] employment and create an abusive work environment."  Ponte v. Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014) (quoting Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007)).

Artesi's hostile work environment claim is based on the comments made by defendant Labatte when he was manager of the Somersworth store, as described supra.  Defendants argue that the evidence of alleged harassment in this case is insufficient to constitute a hostile work environment based on Artesi's disability.  The court agrees.

While there is "no mathematically precise test to determine whether a plaintiff presented sufficient evidence that she was subjected to a severely or pervasively hostile work environment," Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (internal quotation marks and alteration omitted), she must show that her "workplace was permeated with

discriminatory intimidation, ridicule, and insult that was
sufficiently severe or pervasive to alter the conditions of
[her] employment and create an abusive working environment."
Quiles-Quiles, 439 F.3d at 7 (alterations omitted) (quoting
Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  The
harassment must be "both objectively and subjectively offensive,
such that a reasonable person would find it hostile or abusive
and the victim in fact did perceive it to be so."  Ponte, 741
F.3d at 320 (quoting Forrest, 511 F.3d at 228).

    Courts consider factors such as the "frequency of the
discriminatory conduct; its severity; whether it is physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance."  Noviello v. City of Boston, 398 F.3d 76, 92 (1st
Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S.
775, 787-88 (1998)).  "Case law is clear that simple teasing,
offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the terms
and conditions of employment to establish an objectively hostile
or abusive work environment."  Colón-Fontánez v. Municipality of
San Juan, 660 F.3d 17, 44 (1st Cir. 2011) (internal quotation
marks omitted).  The court must "distinguish between the
ordinary, if occasionally unpleasant, vicissitudes of the
workplace and actual harassment."  Id. (quoting Noviello, 398

F.3d at 92).  As this inquiry is necessarily fact-specific, the determination is often reserved for a fact finder.  <u>Pomales</u>, 447 F.3d at 83 (citing <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 19 (1st Cir. 2002)).  Nevertheless, "summary judgment is an appropriate vehicle for 'polic[ing] the baseline for hostile environment claims[.]'"  <u>Id.</u> (quoting <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).

As detailed in Artesi's affidavit, Labatte's comments about her disabilities[12] occurred in 2014 and 2016.  Artesi Aff. (Doc. No. 18-2) ¶¶ 7, 10.  Following gynecological surgery in March 2014, Labatte, on one occasion, said to Artesi, "you're all worn out . . . Too old."  <u>Id.</u> ¶ 7a.  On one other occasion, Labatte said, "If you had a kid, it wouldn't be right."  <u>Id.</u> ¶ 7b.  And on a monthly basis, Labatte said, in Artesi's presence, "Good morning ladies.  Oh you too, Jenn."  <u>Id.</u> ¶ 7c.  In 2016, Labatte commented, "What are you good for now?" in front of two of Artesi's co-workers, as well as "What guy would want you now?"[13]

---

[12]Artesi maintains that her post-surgical status rendered her "disabled" within the meaning of the relevant state and federal statutes.  As the defendants do not object to this categorization, the court accepts it for purposes of this motion.

[13]Although Artesi claims that a handful of other comments made by Labatte after her 2016 marriage are disability-related, they can only fairly be read as comments on her gender, which the court will address in its discussion of Counts III and IV.

These comments, made on two or three separate occasions over three years, fall short of demonstrating that Artesi's workplace "was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Quiles-Quiles, 439 F.3d at 7. Labatte's comments about Artesi's disabilities are undoubtedly offensive. Even if they are regarded as severe, "this evidence, even in the light most favorable to [the plaintiff] falls far short of the 'constant mockery' or 'constant ridicule' sufficient to prove" pervasiveness, as is required. Posteraro, 159 F. Supp. 3d at 289 (D.N.H. 2016). Accordingly, DeMoulas is entitled to summary judgment on Artesi's claim of disability-based hostile work environment in Counts I and II.[14]

## 2. Failure to Accommodate

Artesi also claims within Counts I and II that DeMoulas failed to accommodate her disability by extending her leave. Because there remain factual disputes about when and whether Artesi asked DeMoulas for such an accommodation, and whether

_____

[14]Artesi references a series of offensive comments made by Labatte that she only learned about from Ms. Barnum after her termination. Artesi Aff. (Doc. No. 18-2) ¶ 12d. Given that she was unaware of these comments while working at DeMoulas, they cannot support the required subjective element of her hostile environment claim.

such an accommodation would be reasonable, the court denies summary judgment on this claim.

Employers are required to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); N.H. Rev. Stat. Ann. § 354-A:7, VII(a). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An employer is relieved of the obligation to accommodate a qualified employee if "the accommodation would impose an undue hardship on the operation of the business." Id. at § 12112(b)(5)(A). Courts have recognized that in some cases, an employee's request for a period of medical leave can be considered a reasonable request for accommodation of a disability. See Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 128 (1st Cir. 2017); García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647 (1st Cir. 2000); Willinghan v. Town of Stonington, 847 F. Supp. 2d 164, 188 (D. Me. 2012). But the request for accommodative leave, like any other request for accommodation, must be "facially reasonable." Echevarria, 856 F.3d at 127.

To prevail on a failure-to-accommodate claim, an employee must establish that (1) she was disabled within the meaning of

the ADA; (2) she was qualified to perform the essential functions of either his existing position or another available job, with or without reasonable accommodation; and (3) the employer knew of her disability and did not reasonably accommodate it.  See Audette v. Town of Plymouth, MA, 858 F.3d 13, 20-21 (1st Cir. 2017).

To trigger a duty to accommodate, an employer must be on notice that an employee is seeking an accommodation.  Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007); Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001).  This means the employee "must explicitly request an accommodation, unless the employer otherwise knew one was needed."  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012).  Special words, like "reasonable accommodation," are not necessary, but the employee's request "must be sufficiently direct and specific, and it must explain how the accommodation is linked to [her] disability."  Id.

DeMoulas makes two related arguments in support of summary judgment on this claim.  First, DeMoulas asserts that it did accommodate Artesi by extending her FMLA leave to January 23, 2017, two weeks beyond its expiration.  Second, DeMoulas maintains that Artesi never requested additional leave beyond January 23.  While the first point is undoubtedly true as a factual matter, the court cannot say on this record whether the

two-week extension was a reasonable accommodation.  Next, the
record does not conclusively support DeMoulas' second argument.
It is true, as defendants point out, that Artesi herself did not
contact DeMoulas until February 28, 2017, roughly three weeks
after she returned to New Hampshire and more than one month
after her extended FMLA leave expired.  And it is undisputed
that even during the February 28 phone call, Artesi did not ask
for additional time off, but instead "decided to come in to
work" on March 6, 2017, the date her doctor released her for
return after her February 15, 2017 appointment.

Nevertheless, the record demonstrates that Artesi
originally sought leave until February 6, 2017 and that her
husband called DeMoulas on February 10, 2017, two days after
Artesi returned from Florida, and informed Labatte that Artesi
would determine a return date after her next medical
appointment.  Artesi Aff. (Doc. No. 18-2) ¶ 33.  In addition,
the record shows that DeMoulas received a copy of Dr. Yarian's
return-to-work letter on February 22, 2017.  While the evidence
is far from overwhelming, it is sufficient to create a genuine
issue as to whether DeMoulas' two-week extension was reasonable
or whether DeMoulas was aware that Artesi was seeking additional
leave as an accommodation.

In addition, whether additional leave would have created an
undue hardship for DeMoulas is not susceptible to resolution on

this summary judgment record.  The burden to show undue hardship always remains with the employer.  <u>Reed</u>, 244 F.3d at 258.  The analysis is "fact-intensive."  <u>Garcia-Ayala</u>, 212 F.3d at 650. Proof of an "undue hardship" can include financial impacts, accommodations that are unduly extensive, substantially disruptive, or that would fundamentally alter the nature or operation of the business.  <u>Id.</u> (citing 29 C.F.R. § 1630.2(p)). DeMoulas has offered no evidence or argument on this point, thus, in addition to determining whether DeMoulas' two-week extension was a reasonable accommodation and whether Artesi sought an accommodation, it will be for "the jury to decide whether" additional leave would have created an undue hardship. <u>See</u> <u>EEOC v. Wesley Health Sys., LLC</u>, No. 2:17-CV-126-KS-MTP, 2018 WL 6052581, at *2 (S.D. Miss. Nov. 19, 2018) (observing that whether an accommodation poses an "undue hardship" for an employer is a question of fact) (citing <u>EEOC v. Universal Mfg.</u> <u>Corp.</u>, 914 F.2d 71, 74 (5th Cir. 1990)).

Accordingly, defendant's motion for summary judgment is denied with respect to plaintiff's reasonable accommodation claim in Counts I and II.

C.  Gender Discrimination (Counts III and IV)

In Counts III and IV, Artesi alleges that DeMoulas discriminated against her on the basis of her gender by establishing or tolerating a hostile working environment.

To prevail on a claim of a sexually hostile work environment, Plaintiff must prove:

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find
> it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Ponte, 741 F.3d at 320.

In support of her claim, Artesi relies on Labatte's comments above, which, in the light most favorable to Artesi, also relate to her gender.  In addition, after Artesi's wedding in September 2016, Labatte made the following three comments to her: 1) "You'll always be Tapscott," (her maiden name); 2) "How long do you think [the marriage] is going to last? It won't be long."; and 3) "Poor guy." (referring to her husband, said in front of co-workers).  Artesi Aff. (Doc. No. 18-2) ¶ 11a-c.

As with her claim of disability harassment, the court agrees with the defendants that the gender-based harassment was not severe or pervasive or objectively and subjectively

25

offensive to a degree that a reasonable person would find it
hostile or abusive.  These sporadic comments, made on a few
occasions separated by years in between, lack the necessary
severity and frequency to support plaintiff's hostile
environment claim.  Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st
Cir. 2013).  Moreover, the comments, while offensive, did not
involve threats and the record does not suggest that Labatte's
offensiveness interfered with Artesi's work.  As Judge Laplante
observed in Posteraro, supra,

> This stands in contrast to, for example "the
> disgusting comments, conversations and treatment of
> [plaintiff that] were continuing consistent and
> occurred everyday." White v. N.H. Dep't. of Corr.,
> 221 F.3d 254 260 (1st Cir. 2000). It is certainly true
> that isolated incidents "if egregious enough" can
> evince a hostile work environment. Ponte, 741 F.3d at
> 320 (citing [Noviello], 398 F.3d [at] 84; see e.g.,
> Billings v. Town of Grafton, 515 F.3d 39, 47-50 (1st
> Cir. 2008) (reversing a grant of summary judgment in
> favor of employer on a hostile work environment claim
> where supervisor repeatedly and egregiously stared at
> a female employee's breasts on many occasions over a
> multi-year period). But here, even if the court
> assumes that Posteraro's work performance was
> interfered with, the co-worker comments she complains
> of were neither frequent nor pervasive, nor was any
> particular comment egregious enough to support a
> hostile environment sexual harassment claim.

159 F. Supp. 3d at 287 (alteration in original).

The same reasoning leads to the same conclusion here.
Accordingly, defendants are entitled to summary judgment on
Counts III and IV.

D. Retaliation (Count VI)

In Count VI, Artesi asserts that the defendants retaliated against her for exercising her rights under the ADA and the NHLAD.

The ADA's retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). For purposes of that provision, seeking an accommodation is protected conduct. Freadman, 484 F.3d at 106. To establish a retaliation claim under the ADA, plaintiff "must show that: (1) she was engaged in protected conduct; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." Colón-Fontánez, 660 F.3d at 36. If Artesi is able to make out a prima facie case of unlawful retaliation, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision. The employer's burden is one of production, not persuasion." Carreras v. Sajo, García & Partners, 596 F.3d 25, 36 (1st Cir. 2010) (citations and internal punctuation omitted). Ultimately, the burden reverts to Artesi to point to record evidence sufficient to permit a reasonable jury to conclude that DeMoulas' proffered explanation is merely a pretext for unlawful discrimination and that her

employment was actually terminated in retaliation for having sought reasonable accommodation of her disability. <u>Hughes v. So. N.H. Servs., Inc.</u>, No. 11-cv-516-SM, 2012 WL 5904949, at *6 (D.N.H. Nov. 26, 2012).

As the court has previously explained, <u>see</u> Sec. III.B.2, Artesi has presented enough evidence to survive summary judgment on her failure to accommodate claim, because there remain questions of fact as to whether she requested the accommodation of additional leave and the duration of any such request. Likewise, the sequence of events that followed Artesi's return to New Hampshire could lead a reasonable jury to that Artesi has met her burden of demonstrating that Demoulas retaliated against her for that request.

First, shortly after Artesi's return to New Hampshire, her husband informed defendant Labatte that Artesi planned to return to work when she was medically cleared. Artesi Aff. (Doc. No. 18-2) ¶ 33. Next, DeMoulas was informed of Artesi's medical clearance in Dr. Yarian's February 22, 2017, letter. Doc. No. 16-12. Shortly thereafter, On February 28, 2017, Artesi called DeMoulas to find out her work schedule. Artesi Aff. (Doc. No. 18-2) ¶ 35. Assistant Store Manager Paquette told her he thought she was on the schedule. <u>Id.</u> Then, in a letter dated the next day, March 1, 2017, DeMoulas informed Artesi that her insurance had lapsed effected February 18, 2018, because she had

been terminated.  Doc. No. 16-13.  Nevertheless, on March 3, 2017, when Artesi responded to the letter by specifically asking Ms. Pelletier in Demoulas' human resources department whether she had been fired, Ms. Pelletier was non-committal.  Artesi Aff. (Doc. No. 18-12) ¶ 37.  She was only told of her termination upon arrival at work on March 6, 2017.  <u>Id.</u> ¶ 40.

Temporal proximity between protected conduct and an adverse employment action, without more, is insufficient to permit a trier-of-fact to conclude that the plaintiff was the victim of unlawful retaliatory discrimination.  <u>See</u>, <u>e.g.</u>, <u>Alvarado v. Donahoe</u>, 687 F.3d 453, 464 (1st Cir. 2012).  Here, DeMoulas' proffered reason for terminating Artesi was that she abandoned her job.  Def. Mem. (Doc. No. 16-1) at 16.  But given the timeline described above, a reasonable jury could conclude that this was a pretext, as Artesi consistently demonstrated her intent to return to her job, from the time her husband called the store on February 10, 2017, up until the time she actually did appear at work on March 6, 2017.  Finally, Artesi's first indication that she had been terminated, the March 1, 2017, letter (referring back to February 18, 2017), came almost immediately after she had asked the assistant store manager about her schedule, suggesting her planned imminent return to work.  Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that DeMoulas decided to

fire Artesi when she informed them that she was ready to return to work, in retaliation for seeking additional leave.

Accordingly, summary judgment is denied as to Count VI.


## E. Aiding and Abetting Discrimination (Count V) (Labatte only)

Relying only on state law, Artesi alleges that Labatte aided and abetted DeMoulas' discriminatory actions.

N.H. Rev. Stat. Ann. § 354-A:2 XV(d) indicates that unlawful discriminatory practices include "aiding, abetting, inciting, compelling or coercing another or attempting to aid, abet, incite, compel, or coerce another to commit an unlawful discriminatory practice . . . ." An individual may be held liable for aiding and abetting unlawful employment discrimination under RSA 354-A:2 and :7. U.S. Equal Emp't. Opportunity Comm'n v. Fred Fuller Oil Co., 168 N.H. 606, 611 (2016).

Here, the two alleged "unlawful discriminatory practices" surviving summary judgment are Artesi's claims for failure to accommodate her disability by extending her leave time, see Sec. III.B.2, supra, and her retaliation claim. See Sec. III.D, supra. According to Artesi, when she reported to work on March 6, 2017, Labatte told her that he had received all of her FMLA paperwork and medical records, including the letters indicating that she could return to work on March 6, 2017. Artesi Aff.

(Doc. No. 18-2) ¶ 39.  He made this comment despite having
previously told John Artesi that he had not heard from plaintiff
in eight weeks.  Id. ¶ 33.  Given DeMoulas' position that it
terminated Artesi's employment because she abandoned her job, a
reasonable jury could find that Labatte withheld information
that suggested otherwise, that could have affected DeMoulas'
decision, and thus abetted DeMoulas' discriminatory actions.
Accordingly, summary judgment is denied as to Count V.


## IV.  Conclusion

Undoubtedly, the issues the defendants have raised in their
motion point towards weaknesses in Artesi's case.  But summary
judgment "is not a device to be employed by a trial court to
dispose of litigation simply because it appears that the
plaintiff may have a weak case."  Garter-Bare Co. v.
Munsingwear, Inc., 650 F.2d 975, 979 (9th Cir. 1980).  The
question at the summary judgment stage is not whether a jury is
sure to find a verdict for the plaintiff; the question is
whether a reasonable jury could rationally so find.  Hoyle v.
Freightliner, LLC, 650 F.3d 321, 334 (4th Cir. 2011) (emphasis
in original).

For the reasons set forth herein, defendants' motion for
summary judgment (Doc. No 16) is DENIED as to plaintiff's
reasonable accommodation claims against DeMoulas in Counts I and

II, and her retaliation claim, Count VI, and her claim against Dennis Labatte in count V. Defendants' motion is GRANTED in all other respects.

Now that the claims in the case have been narrowed, the parties would be well-advised to engage in good faith discussions or mediation to determine whether the case might be resolved before the parties and the court expend the time and resources necessary for a trial.

SO ORDERED.

Andrea K. Johnstone
United States Magistrate Judge

June 2, 2020

cc:  Counsel of Record